**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| RYAN PORTER, individually and on behalf of all others similarly situated, )<br><br>Plaintiff, )<br><br>v. )<br><br>NBTY, INC., UNITED STATES NUTRITION, INC., HEALTHWATCHERS (DE), INC., and MET-RX NUTRITION, INC., )<br><br>Defendants. | Case No. 15-cv-11459 <br><br> **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Ryan Porter ("Plaintiff"), through his undersigned attorneys, Siprut PC and Barbat, Mansour & Suciu PLLC, brings this Class Action Complaint against Defendants NBTY, Inc., United States Nutrition, Inc., Healthwatchers (DE), Inc., and Met-Rx Nutrition, Inc. (collectively, the "Defendants"), individually and on behalf of all others similarly situated, and complains and alleges upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by his attorneys:

## I. NATURE OF THE ACTION

1.    This is a civil class action brought individually by Plaintiff and on behalf of all consumers who purchased the protein supplements Body Fortress Super Advanced Whey Protein, Body Fortress Super Advanced Whey Isolate and Met-Rx MyoSynthesis Whey (collectively, the "Products") from Defendants. Defendants engaged in unfair and/or deceptive business practices

by misrepresenting the nature and quality of the Products on the Products' labels, and were unjustly enriched.

2.      Defendants make numerous false and misleading claims on the labels of their Products. These false and misleading claims include, but are not limited to, statements relating to protein content in regards to the percent of daily value, sources of the protein content, and quality of protein.

3.      Defendants do not comply with federal and parallel state regulations regarding the testing methodology of the Products' protein content, making the Products' protein claims false and misleading.

4.      Plaintiff and each of the Class members accordingly suffered an injury in fact caused by the false, fraudulent, unfair, deceptive, and misleading practices set forth herein, and seek compensatory damages and injunctive relief.

## II. JURISDICTION AND VENUE

5.      This Court has original jurisdiction over this controversy pursuant to 28 U.S.C. § 1332(d), Plaintiff's claims and the claims of the other members of the Class exceed $5,000,000 exclusive of interest and costs, and there are numerous Class members who are citizens of states other than Defendants' states of citizenship.

6.      Diversity jurisdiction exists because Plaintiff is a citizen of Illinois and Defendants are citizens of Delaware and New York.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (c) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District and because Defendants transact business and/or has agents within this District.

### III. PARTIES

8. Plaintiff Ryan Porter is a resident of Illinois who has purchased Body Fortress Super Advanced Whey Protein on several occasions over the past three years from retail stores located in Illinois, including Super Target and Walgreens.

9. NBTY, Inc. is licensed in the state of Delaware, with a principal place of business located at 2100 Smithtown Avenue, Ronkonkoma, New York 11779. Upon information and belief, NBTY, Inc. has a controlling interest in Defendants United States Nutrition, Inc., Healthwatchers (DE), Inc. and Met-Rx, Inc.

10. Defendant NBTY, Inc. ("NBTY") is the parent company of Defendants United States Nutrition, Inc. and Healthwatchers, Inc.

11. United States Nutrition, Inc. is licensed in the state of Delaware, with a principal place of business located at 90 Orville Drive, Bohemia, New York 11716. Upon information and belief, United States Nutrition, Inc. is a subsidiary of Defendant NBTY, Inc.

12. Healthwatchers (DE), Inc. is licensed in the state of Delaware, with a principal place of business located at 90 Orville Drive, Bohemia, New York 11716. Upon information and belief, Healthwatchers (DE), Inc. is a subsidiary of Defendant NBTY, Inc.

13. Met-Rx Nutrition, Inc. is licensed in the state of Delaware, with a principal place of business located at 2100 Smithtown Avenue, Ronkonkoma, New York 11779. Upon information and belief, Met-Rx Nutrition, Inc. is a subsidiary of Defendant NBTY, Inc.

### IV. GENERAL ALLEGATIONS

*Overview Of Whey Protein And "Protein Spiking"*

14. Whey is a complete protein source, meaning it contains all the essential amino acids needed to build protein-based compounds such as muscle tissue, skin, fingernails, hair and

enzymes. It is especially rich in branded-chain amino acids—leucine, isoleucine, and valine—which are metabolized directly within the muscles (as opposed to being processed in the liver first).

15.     Sales of whey protein products are expected to grow 62% and reach U.S. $7.8 billion by 2018.[1] However, due to the high level of competition in the market and the escalating price of wholesale whey protein, sellers' profit margins are slim.

16.     Defendants designed, manufactured, warranted, advertised and sold the Products throughout the United States, including the state of Illinois, and continue to do so.

17.     To reduce their protein manufacturing costs and enhance the nitrogen content of the Products, Defendants engage in what is commonly referred to as "protein-spiking," "nitrogen-spiking," or "amino-spiking." Defendants add nitrogen-containing, cheap, and less beneficial free form amino acids and non-protein ingredients to the Products.

18.     Because nitrogen is the "tag" used in protein content calculation, the addition of such ingredients is not revealed by protein content testing. In fact, the testing method is neither a direct measure of the actual protein content in the Products, nor a measure of the type of nitrogen-containing compounds in the Products.

19.     Further, this nitrogen testing is not the mandated testing methodology referenced in the Food, Drug and Cosmetic Act (the "FDCA").

20.     Protein-spiking has been condemned by the American Herbal Products Association, which recently issued a standard for manufacturers to measure the true protein content of their products.[2] In addition, General Nutrition Centers, Inc. ("GNC"), one of the largest

---

[1] *See Sports Nutrition in the US*, EUROMONITOR INT'L, http://www.euromonitor.com/sports-nutrition-in-the-us/report (last visited Dec. 18, 2015).
[2] The standard: (1) defines protein as a "chain of amino acids connected by peptide bonds"; and (2) provides for the exclusion of non-protein nitrogen-containing substances for protein-content calculation and labeling purposes. AM. PUBLIC HEALTH ASS'N, www.apha.org/default.aspx?tabid=441 (last visited July 14, 2015).

distributors of whey protein products in the United States, has publicly criticized protein-spiking as having the effect of misleading consumers, who are unaware of the actual protein content of the spiked products they purchase.[3]

21.     Not only has the American Herbal Products Association and GNC condemned this deceptive practice, but the United States Food and Drug Administration ("FDA") has done so as well. Indeed, FDA press officer, Jennifer Dooren, explained,

> FDA requires that dietary supplements be labeled in a manner that is truthful and not misleading. With regard to the labeling of protein content, FDA's expectation for proper nutrition labeling is that firms will evaluate the protein content from actual protein sources—not other nitrogen-containing ingredients such as individual amino acids—and label the products consistent with the results of such evaluations."[4]

22.     The FDA has also stated that the actual protein is what counts, and loading up on nitrogen-rich ingredients to inflate protein claims does not meet FDA standards.[5]

23.     The FDCA also represents that free-form amino acids are simply not protein. Under 21 C.F.R. § 101.36(b)(2)(i), a manufacturer is prohibited from claiming a product has any protein content if the product only contains amino acids.

24.     Also, the FDCA requires a more sophisticated form of protein testing for products that state the percentage daily value of protein. This testing methodology is called the Protein Digestibility-Corrected Amino Acid Score ("PDCAAS"), which measures the actual *quality* of the protein contained in a product.

---

The National Academy of Sciences similarly defines protein as macromolecules with links of amino acids; excluded from the definition are free form amino acids and creatine.
[3] *Is Your Protein Scamming You?*, GNC LIVE WELL, www.gnclivewell.com/realprotein (last visited Dec. 18, 2015).
[4] Alex Morrell, *Lawsuits Say Protein Powders Lack Protein, Ripping Off Athletes*, FORBES (Mar. 12, 2015, 11:21 AM), http://www.forbes.com/sites/alexmorrell/2015/03/12/lawsuits-say-protein-powders-lack-protein-ripping-off-athletes/.
[5] *Id.*

25.     The PDCAAS has been adopted by the Food and Agriculture Organization of the United Nations and the World Health Organization as the preferred method for the measurement of the protein value in human nutrition, and is directly referenced in the FDCA.

26.     Under the FDCA, the PDCAAS calculation is as follows:

$$PDCAAS(\%) = \frac{mg\ of\ limiting\ amino\ acid\ in\ 1\ g\ of\ test\ protein}{mg\ of\ same\ amino\ acid\ in\ 1\ g\ of\ reference\ protein} \times fecal\ true\ digestibility\ (\%) \times 100$$

27.     The PDCAAS method does not calculate protein by nitrogen, as Defendants would like, but rather by this equation, which requires the manufacturer to determine the amount of essential amino acids contained within the product.

28.     This testing method ensures that consumers are being informed about the "quality" of the protein that a product contains.

29.     Industry leaders, the FDA, and actual scientific testing are consistent in acknowledging and establishing that the free-form amino acids and creatine monohydrate that Defendants add to their Products are simply ***not*** protein.

30.     Despite knowledge that protein spiking is misleading to consumers, Defendants continue to advertise, distribute, label, manufacture, market, and sell the Products in an illegal, misleading and deceptive manner in order to increase their sales and maximize their profits.

31.     Several studies show that because free-form amino acids are not absorbed as effectively as whole protein, they do not provide the same beneficial effects as whole protein.[6]

---

[6] MAURO G. DI PASQUALE, AMINO ACIDS AND PROTEINS FOR THE ATHLETE: THE ANABOLIC EDGE 190 (2d Ed. 2008); Christos S. Katsanos et al., *Whey protein ingestion in elderly results in greater muscle protein accrual than ingestion of its constituent essential amino acid content*, 28 NUTRITION RES. 651 (2008); Hugues Magne et al., *Contrarily to whey and high protein diets, dietary free leucine supplementation cannot reverse the lack of recovery of muscle mass after prolonged immobilization during ageing*, 590 J. PHYSIOLOGY 2035 (2012); Tomohiro Terada & Ken-ichi Inui, *Peptide transporters: structure, function, regulation and application for drug delivery*, 5 CURRENT DRUG METABOLISM 85 (2004).

32.     Thus, Defendants' consumers pay an inflated price for the Products, which delivers less actual protein than they reasonably expect.

***Defendants' False Claims Of Protein Content And Percent Of Daily Value Of Protein***

33.     According to the FDA,

> The percent of the DRV [Daily Reference Value] is required if a protein claim is made for the product or if the product is represented or purported to be for use by infants or children under 4 years of age. Based on current scientific evidence that protein intake is not a public health concern for adults and children over 4 years of age, and because of the costs associated with a determination of the Protein Digestibility Corrected Amino Acid Score (PDCAAS), FDA has determined that declaration of the percent of the DRV for protein need not be provided when a claim is not made.[7]

34.     The Products have a protein claim on the label, and therefore are required to have the percent of Daily Value ("DV") listed in the Supplement Facts section. Defendants list the Products as having 52% DV for protein. This is based on the 50-gram DV determined by the FDCA and the 26-gram protein claim on the Products. 21 C.F.R. § 101.9(c)(7)(iii).

35.     When protein is listed as a percent of the 50-gram DV and expressed as % DV, the % DV is calculated by correcting the actual amount of protein in grams per serving by: (a) multiplying the amount by its amino acid score corrected for protein digestibility; (b) dividing by 50 grams; and (c) converting to a percentage. 21 C.F.R. § 101.9(c)(7)(ii).

36.     However, Defendants simply used the nitrogen testing with a factor of 6.25 to determine the protein content, referenced in 21 C.F.R. § 101.9(c)(7).

---

[7] *Guidance for Industry: A Food Labeling Guide*, U.S. FOOD AND DRUG ADMIN., http://www.fda.gov/Food/GuidanceRegulation/GuidanceDocumentsRegulatoryInformation/LabelingNutrition/ucm064894.htm#declare (last visited Dec. 18, 2015).

37. If Defendants made no protein content claims on the labels of their Products, and if they did not include the % DV of protein under the Supplement Facts section, they could legally use this method. But Defendants did use protein claims and did list the % DV on their Products, and thus are statutorily obligated under the FDCA to determine the protein content and % DV by using the PDCAAS formula, which they did not.

38. Defendants' decision not to use the PDCAAS testing methodology mandated in 21 C.F.R. § 101.9(c)(7)(ii) make the Products misbranded and illegal to sell.

39. PDCAAS is currently considered the most reliable score of protein quality for human nutrition. PDCAAS measures protein quality based on human essential amino acid requirements and our ability to digest it. The test protein is compared to a standard amino acid profile and is given a score from 0 to 1.0, with a score of 1.0 indicating maximum amino acid digestibility. Common protein supplements (whey, casein, and soy) all receive 1.0 scores. Meat and soybeans (0.9), vegetables and other legumes (0.7), and whole wheat and peanuts (0.25-0.55) all provide diminished protein digestibility.[8]

40. The PDCAAS shall be determined by the methods provided in sections 5.4.1, 7.2.1, and 8.00 in "Protein Quality Evaluation, Report of the Joint FAO/WHO Expert Consultation on Protein Quality Evaluation," Rome, 1990. 21 C.F.R. § 101.9(c)(7)(ii).

41. Defendants have failed to comply with the applicable sections for determining the protein content making up the % DV. They did not test for individual amino acids, and they did not use the proper factors as referred to in the FDCA.

---

[8] Pasha Gurevich, *Protein Quality-The 4 Most Important Metrics*, LABDOOR MAGAZINE (May 20, 2014), https://labdoor.com/article/protein-quality-the-4-most-important-metrics.

42.     Instead, Defendants simply took the nitrogen count and then used the factor for whey protein, thereby overstating the % DV. Therefore, Defendants are in violation of 21 C.F.R. § 101.9(c)(7)(ii) and their Products are misbranded.

43.     All of Defendants' Products have been shown by independent testing to contain these free-form amino acids and non-protein ingredients as part of their total protein count. *See* Whey Protein Product Testing, attached hereto as Exhibits A-C.

44.     Defendants' Super Advanced Whey Protein Product claims to have 30 grams of protein per scoop and 60% Daily Value of protein per scoop:



45.     Defendants' Super Advanced Whey Isolate Product claims to have 30 grams of protein per scoop and 60% Daily Value of protein per scoop:

46.     Defendants' Met-Rx MyoSynthesis Whey Product claims to have 25 grams of protein per scoop and 50% Daily Value of protein per scoop:

| Serving Size 1 Scoop (45g) Servings Per Container about 27 | | |
|---|---|---|
| **Amount Per Serving** | | **% Daily Value** |
| Calories | 190 | |
| Calories from Fat | 50 | |
| Total Fat | 6 g | 9%** |
| Saturated Fat | 2.5 g | 13%** |
| Cholesterol | 50 mg | 17% |
| Total Carbohydrate | 10 g | 3%** |
| Dietary Fiber | 5 g | 20%** |
| Sugars | 2 g | *** |
| Protein | 25 g | 50%** |
| Calcium | 167 mg | 17% |
| Phosphorus | 98 mg | 10% |
| Magnesium | 13 mg | 3% |
| Sodium | 105 mg | 4% |
| Potassium | 105 mg | 3% |

**Percent Daily Values are based on a 2,000 calorie diet.
***Daily Value not established.

### Ingredients:

Protein Blend (Whey Protein Concentrate, Whey Protein Isolate, Calcium Caseinate), Amino Blend (L-Glycine, Taurine, L-Threonine, L-Glutamine, L-Leucine, L-Isoleucine, L-Valine), Fiber Blend (Oat Fiber, Inulin), Non-Dairy Creamer (Sunflower Oil, Maltodextrin, Sodium Caseinate, Mono- & Di-glycerides, Natural Tocopherols, Tricalcium Phosphate), Medium Chain Triglycerides, Creatine Monohydrate, Natural And Artificial Flavors, Cellulose Gum, Salt, Dicalcium Phosphate, Calcium Carbonate, Acesulfame Potassium, Xanthan Gum, Soy Lecithin, Sucralose.

**Contains milk and soy ingredients.**

47.     The individual free-form amino acids and creatine monohydrate contained within the Products would show up as protein using the nitrogen testing Defendants employed, however, they would not contribute to the final protein content determined by the FDCA's mandated PDCAAS methodology for determining protein as % DV.

48.     Also, because the claims at issue are protein claims, referred to under 21 C.F.R. § 101.9(c)(7)(i), and are not based on the PDCAAS method, they are illegal, false and misleading.

***Defendants' False Claims Regarding The Quality Of Protein Contained Within The Products***

49. The PDCAAS method for testing protein was created specifically to determine the quality of the protein contained within food products.

50. Defendants' Super Advanced Whey Protein Product falsely claims to have 60 grams of "Premium Protein":



51. Defendants chose to include free-form amino acids and creatine monohydrate as part of the protein content in their Super Advanced Whey Protein Product. Because the correct methodology would have produced a smaller amount of "quality" protein contained within the Product, Defendants' claim that the Product contains 60 grams of "Premium" protein is false and misleading.

52.     Defendants' Super Advanced Whey Isolate Product falsely claims to have 60 grams of "Ultra-Pure Protein":



53.     Defendants chose to include free-form amino acids as part of the protein content in their Super Advanced Whey Isolate Product. Because the correct methodology would have a produced a smaller amount of "quality" protein contained within the Product, Defendants' claim that the Product contains 60 grams of "Ultra Pure" protein is false and misleading.

54.     Pursuant to 21 U.S.C. § 321(ff), Defendants' Products constitute a "food" regulated by the FDCA, 21 U.S.C. § 301 *et seq.*, and other FDCA regulations.

-13-

55. Defendants' false, deceptive and misleading label statements violate 21 U.S.C. § 343(a)(1) and the so-called "little FDCA" statutes adopted by many states,[9] which deem food misbranded when "its labeling is false or misleading in any particular."

56. Defendants' false, deceptive and misleading label statements are unlawful under state Unfair and Deceptive Acts and Practices Statutes and/or Consumer Protection Acts, which prohibit unfair, deceptive or unconscionable acts in the conduct of trade or commerce.

57. Illinois has expressly adopted the federal food labeling requirements as its own: "[a] federal regulation automatically adopted pursuant to this Act takes effect in this State on the date it becomes effective as a Federal regulation." 410 ILCS 620/21. Thus, a violation of federal food labeling laws is an independent violation of Illinois law and actionable as such.

58. Further, as explained above, Defendants' claims are misleading to consumers in violation of 21 U.S.C. § 343, which states that a food shall be deemed to be misbranded "[i]f its labeling is false or misleading in any particular."

59. Illinois law incorporates the exact language of the FDCA in 410 ILCS 620/11 by stating, "[a] food is misbranded – (a) If its labeling is false or misleading in any particular."

60. The introduction of misbranded food into interstate commerce is prohibited under the FDCA and all state parallel statutes cited in this Class Action Complaint.

61. Also, the Illinois Consumer Fraud and Deceptive Business Practices Act provides protection for consumers when purchasing products, including Defendants' Products, by stating,

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . .

---

[9] *See, e.g.*, 410 ILCS 620/11.

815 ILCS 505/2.

62.     Defendants intended for Plaintiff and the Class members to be misled.

63.     Defendants' misleading and deceptive practices proximately caused harm to the Plaintiff and the Class.

## V. CLASS ACTION ALLEGATIONS

64.     Plaintiff brings this action individually and as representatives of all those similarly situated pursuant to Federal Rule of Civil Procedure 23 on behalf of the below-defined Classes:

> **National Class:** All persons in the United States that purchased the Products.

> **Consumer Fraud Multi-State Class:** All persons in the states of California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, and Washington that purchased the Products.[10]

> **Illinois Subclass:**  All persons in the state of Illinois that purchased the Products.

Excluded from the Classes are Defendants and their affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded are any judicial officers presiding over this matter and the members of their immediate families and judicial staff.

65.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

66.     **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of the Classes are so numerous that their individual joinder herein is impracticable. On information and

---

[10] The states in the Consumer Fraud Multi-State Class are limited to those states with similar consumer fraud laws under the facts of this case: California (Cal. Bus. & Prof. Code § 17200, *et seq.*); Florida (Fla. Stat. § 501.201, *et seq.*); Illinois  (815 Ill. Comp. Stat. 505/1, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*); Michigan (Mich.  Comp. Laws § 445.901, *et seq.*); Minnesota (Minn. Stat. § 325F.67, *et seq.*); Missouri (Mo. Rev. Stat. §407.010, *et seq.*); New Jersey (N.J. Stat. § 56:8-1, *et seq.*); New York (N.Y. Gen. Bus. Law § 349, *et seq.*); and Washington (Wash. Rev. Code § 19.86.010, *et seq.*).

belief, Class members number in the thousands to millions. The precise number of Class members and their addresses are presently unknown to Plaintiff, but may be ascertained from Defendants' books and records. Class members may be notified of the pendency of this action by mail, email, Internet postings, and/or publication.

67.     **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Such common questions of law or fact include:

a.   The true nature and quality of the protein in the Products;

b.   Whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products is deceptive;

c.   Whether Defendants' actions violate  the state consumer fraud statutes invoked below;

d.   Whether Defendants were unjustly enriched at the expense of the Plaintiff and Class members; and

e.   Whether Defendants breached an express warranty to Plaintiff and Class members.

68.     Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of himself and the other Class members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

69.     **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the claims of the other members of the Classes because, among other things, all Class

members were comparably injured through Defendants' uniform misconduct described above. Further, there are no defenses available to Defendants that are unique to Plaintiff.

70. **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the other Class members he seeks to represent, he has retained counsel competent and experienced in complex class action litigation, and he will prosecute this action vigorously. The Classes' interests will be fairly and adequately protected by Plaintiff and his counsel.

71. **Insufficiency of Separate Actions – Federal Rule of Civil Procedure 23(b)(1).** Absent a representative class action, members of the Classes would continue to suffer the harm described herein, for which they would have no remedy. Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue hardship and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated purchasers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendants. The proposed Classes thus satisfy the requirements of Fed. R. Civ. P. 23(b)(1).

72. **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Classes as a whole.

73. **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The

damages or other financial detriment suffered by Plaintiff and the other members of the Classes are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI. <u>CLAIMS ALLEGED</u>

### <u>COUNT I</u>
**Violation Of State Consumer Fraud Acts**
**(On Behalf Of The Multi-State Class)**

74.     Plaintiff incorporates paragraphs 1-73 as if fully set forth herein.

75.     The Consumer Fraud Acts of the states in the Consumer Fraud Multi-State Class[11] prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

76.      Defendants intended that Plaintiff and each of the other members of the Consumer Fraud Multi-State Class would rely upon their deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

---

[11] California (Cal. Bus. & Prof. Code § 17200, *et seq.*); Florida (Fla. Stat. § 501.201, *et seq.*); Illinois (815 Ill. Comp. Stat. 505/1, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*); Michigan (Mich. Comp. Laws § 445.901, *et seq.*); Minnesota (Minn. Stat. § 325F.67, *et seq.*); Missouri (Mo. Rev. Stat. § 407.010, *et seq.*); New Jersey (N.J. Stat. § 56:8-1, *et seq.*); New York (N.Y. Gen. Bus. Law § 349, *et seq.*); and Washington (Wash. Rev. Code § 19.86.010, *et seq.*).

77.     As a result of the Defendants' use or employment of unfair or deceptive acts or business practices, Plaintiff and each of the other members of the Consumer Fraud Multi-State Class have sustained damages in an amount to be proven at trial.

78.     In addition, Defendants' conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

**COUNT II**
**Violation Of Illinois Consumer Fraud Act**
**(In The Alternative To Count I And On Behalf Of The Illinois Subclass)**

79.     Plaintiff incorporates paragraphs 1-73 as if fully set forth herein.

80.     The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, *et seq.*, prohibits the use of unfair or deceptive business practices in the conduct of trade or commerce. The ICFA is to be liberally construed to effectuate its purpose.

81.     Defendants intended that the Plaintiff and each of the other members of the Illinois Subclass would rely upon their deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

82.     As a result of the Defendants' use or employment of unfair or deceptive acts or business practices, Plaintiff and each of the other members of the Illinois Subclass have sustained damages in an amount to be proven at trial.

83.     In addition, Defendants' conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

**COUNT III**
**Breach Of Express Warranty**
**(On Behalf Of The National Class)**

84.     Plaintiff incorporates paragraphs 1-73 as if fully set forth herein.

85.     Plaintiff, and each member of the National Class, formed a contract with Defendants at the time Plaintiff and the other National Class members purchased the Products. The terms of the contract includes the promises and affirmations of fact made by Defendants on the Products' packaging and through marketing and advertising, as described above. This labeling, marketing and advertising constitute express warranties and became part of the basis of bargain, and are part of the standardized contract between Plaintiff and the members of the National Class and Defendants.

86.     Defendants purport through their advertising, labeling, marketing and packaging to create an express warranty that the Products contained specific qualities of protein and protein content.

87.     Plaintiff and the National Class performed all conditions precedent to Defendants' liability under this contract when they purchased the Products.

88.     Defendants breached express warranties about the Products and their qualities because Defendants' statements about the Products were false and the Products do not conform to Defendants' affirmations and promises described above.

89.     Plaintiff and each of the members of the National Class would not have purchased the Products had they known the true nature of the Products' ingredients and what the Products contained.

90.     As a result of Defendants' breach of express warranty, Plaintiff and each of the members of the National Class have been damaged in the amount of the purchase price of the Products and any consequential damages resulting from the purchases.

**COUNT IV**
**Unjust Enrichment**
**(In The Alternative To Count III And On Behalf Of The National Class)**

91.     Plaintiff incorporates paragraphs 1-73 as if fully set forth herein.

92.     Plaintiff and the other members of the National Class conferred benefits on Defendants by purchasing the Products.

93.     Defendants have been unjustly enriched in retaining the revenues derived from Plaintiff and the other members of the National Class' purchase of the Products.  Retention of those monies under these circumstances is unjust and inequitable because Defendants' labeling of the Products was misleading to consumers, which caused injuries to Plaintiff and the other members of the National Class because they would have not purchased the Products if the true facts would have been known.

94.     Because Defendants' retention of the non-gratuitous benefits conferred on them by Plaintiff and the other members of the National Class is unjust and inequitable, Defendants must pay restitution to Plaintiff and the other members of the National Class for their unjust enrichment, as ordered by the Court.

**VII. JURY DEMAND**

Plaintiff hereby demands a trial by jury.

**VIII. REQUEST FOR RELIEF**

WHEREFORE, Plaintiff and the other Class members respectfully request that the Court:

a.     Certify the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b.     Award damages, including compensatory, exemplary, statutory, incidental, consequential, actual, and punitive damages to Plaintiff and the Classes in an amount to be determined at trial;

c.     Award Plaintiff and the Classes their expenses and costs of the suit, pre-judgment interest, post-judgment interest, and reasonable attorneys' fees;

-21-

d. Grant restitution to Plaintiff and the Classes and require Defendants to disgorge their ill-gotten gains;

e. Permanently enjoin Defendants from engaging in the unlawful conduct set forth herein; and

f. Grant any and all such other relief as the Court deems appropriate.

Dated: December 18, 2015               Respectfully submitted,

*/s/ Joseph J. Siprut*
Joseph J. Siprut
*jsiprut@siprut.com*
**SIPRUT PC**
17 N. State Street
Suite 1600
Chicago, Illinois 60602
Phone: 312.236.0000
Fax: 312.878.1342

Nick Suciu III
*nicksuciu@bmslawyers.com*
**BARBAT, MANSOUR & SUCIU PLLC**
434 West Alexandrine
Suite 101
Detroit, Michigan 48201
Phone: 313.303.3472

***Counsel For Plaintiff***
***And The Proposed Putative Classes***

4836-5386-0908, v. 2