UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RYAN PORTER and
HAARIN KWON,

        Plaintiffs,

        v.

NBTY, INC., UNITED STATES
NUTRITION, INC., HEALTHWATCHERS
(DE), INC., and MET-RX NUTRITION,
INC.,

        Defendants.

No. 15 CV 11459

Judge Manish S. Shah

MEMORANDUM OPINION AND ORDER

Plaintiffs bought defendants' whey protein supplements, because the product labels said that they contained 60 grams of protein per serving. It turns out that the products did not contain 60 grams of whey protein, as plaintiffs believed, but 60 grams of a combination of whey protein, free-form amino acids, and other non-protein ingredients. Plaintiffs seek to represent a nationwide class and bring claims under consumer fraud statutes of Illinois, New York, and eight other states, as well as claims for breach of express warranty and unjust enrichment. Defendants move to dismiss plaintiffs' claims.

## I.    Legal Standards

A court must dismiss an action if it determines, at any time, it lacks subject-matter jurisdiction, Fed. R. Civ. P. 12(h)(3), and a defendant may move to dismiss an action for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). The

plaintiff bears the burden of proving that jurisdiction is proper. *Transit Express, Inc. v. Ettinger*, 246 F.3d 1018, 1022 (7th Cir. 2001) (citation omitted). One component of subject-matter jurisdiction is Article III standing—the requirement that plaintiffs present an actual case or controversy. *See Silha v. ACT, Inc.*, 807 F.3d 169, 172–73 (7th Cir. 2015). "[A] plaintiff need only show the existence of facts that could, consistent with the complaint's allegations, establish standing." *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009) (citations omitted).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain factual allegations that plausibly suggest a right to relief. *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 558 (2009)). "The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits." *Triad Assocs., Inc. v. Chicago Hous. Authority*, 892 F.2d 583, 586 (7th Cir. 1989). With a 12(b)(6) motion, a court may only consider allegations in the complaint, documents attached to the complaint, and documents that are both referred to in the complaint and central to its claims. *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998). A court must construe all factual allegations as true and draw all reasonable inferences in the plaintiff's favor, but a court need not accept legal conclusions or conclusory allegations. *Virnich*, 664 F.3d at 212 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 680–82 (2009)).

## II.  Facts

Defendant NBTY, Inc., along with its subsidiaries, defendants United States Nutrition, Inc., Healthwatchers (DE), Inc., and Met-Rx Nutrition, Inc.,

2

manufactured and sold the protein supplements Body Fortress Super Advanced Whey Protein, Body Fortress Super Advanced Whey Isolate, and Met-Rx MyoSynthesis Whey. [30] ¶¶ 1, 9–13, 16.[1] Plaintiff Ryan Porter bought Body Fortress Super Advanced Whey Protein from at least two different retail stores in Illinois. [30] ¶ 7. Plaintiff Haarin Kwon, a New York citizen, ordered the same product from Amazon.com. [30] ¶ 8.

According to the nutrition information on the back label, under the heading "Supplement Facts," Body Fortress Super Advanced Whey Protein contained 30 grams of protein and 60% of the "Daily Value" (also known as the Daily Reference Value) for protein, per scoop. [30] ¶¶ 33, 44. A serving of 2 scoops contained 60 grams and 120% of the Daily Value for protein. [30] ¶ 44. The label on the front of the product contained the statement, "60g Premium Protein." [30] ¶ 50. On other parts of the label, the following additional statements appeared:

1) Premium Whey Protein;
2) Body Fortress Super Advanced Whey Protein delivers a powerful blend of premium proteins athletes need to support lean muscle mass and maximize their training;
3) Body Fortress Super Advanced Whey Protein features a Super Recovery Blend to further enhance the benefits of our premium Whey Protein Blend;
4) Whey is the preferred protein source in sports and bodybuilding nutrition because it contains superior quality Branched Chain Amino Acids—made up of Leucine, Isoleucine and Valine—which are important for the maintenance of muscle tissue; and
5) Contains naturally occurring Branched Chain Amino Acids from protein.

---

[1] Bracketed numbers refer to entries on the district court docket. Plaintiffs' complaint is [30].

[30] ¶ 59. And the label also contained graphs explaining the benefits of ingesting whey protein. [30] ¶ 60. The label of Body Fortress Super Advanced Whey Isolate (a product that plaintiffs did not purchase), contained a similar assortment of statements and graphs, and both Whey Isolate and Met-Rx MyoSynthesis Whey listed nutrition information on the back label, including their protein content expressed both in grams and as a percentage of Daily Value. [30] ¶¶ 45–46, 52, 63–64. Plaintiffs believe that all of these statements (with the exception of the grams of protein per serving size stated on the back label), along with the products' names themselves, were false and misleading and did not comply with federal regulations, because they overstated the amount of whey protein in the products. [30] ¶¶ 65–67.

Plaintiffs allege that defendants engaged in a practice known as "protein-spiking," "nitrogen-spiking," or "amino-spiking" in the manufacture of its whey protein products. [30] ¶ 17. This practice exploited the fact that the protein content of foods is sometimes measured indirectly—by testing for the nitrogen content and multiplying that measurement by a factor of 6.25—and resulted in an inflated measurement on a product's label. [30] ¶ 36. Whey protein is a complete protein source, rich in branched-chain amino acids which are metabolized directly within the muscles. [30] ¶ 14. But defendants included in their whey protein products cheaper, less beneficial free-form amino acids, which are not absorbed as effectively, and not considered to be protein. [30] ¶¶ 17, 31. Plaintiffs allege that defendants also included in their products other non-protein ingredients. [30] ¶ 17. Because these free-form amino acids and additional ingredients contain nitrogen, and the

defendants measured protein content by identifying nitrogen-containing compounds, the free-form amino acids and non-protein incredients contributed to the product's reported total protein content. [30] ¶¶ 17–18.

According to plaintiffs, because the products' labeling highlighted the protein content, defendants should have used an alternative method to calculate those amounts. [30] ¶¶ 24, 37. That alternative method, the Protein Digestibility-Corrected Amino Acid Score, measures the protein quality of the food and requires the manufacturer to determine the amount of essential amino acids contained within the product. [30] ¶¶ 24, 26–28. The digestibility-corrected score provides a more precise measurement of the protein content of the product, excluding free-form amino acids and other non-protein ingredients. [30] ¶ 47. Because defendants used the nitrogen-based measurement rather than the alternative method, the protein-content statements on their products' labels were based on the additional ingredients. [30] ¶¶ 41–43.

Plaintiffs also allege that defendants used the terms "protein" and "whey protein" interchangeably on the products' packaging, leading consumers to believe that every statement of the products' protein content referred to whey protein in particular. [30] ¶ 55. Because those statements overstated the amount of whey protein contained in the products, plaintiffs believe the statements were false and misleading. [30] ¶¶ 51, 53. Plaintiffs bring claims on behalf of a nationwide class

under consumer fraud statutes of Illinois, New York, and eight other states, as well as claims for breach of express warranty and unjust enrichment. *See* [30].[2]

## III. Analysis

### A. Article III Standing

#### 1. Products Purchased

To establish Article III standing, a plaintiff must show that he has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

Defendants argue that plaintiffs cannot satisfy the injury-in-fact requirement with respect to products they did not purchase, and because plaintiffs did not purchase Body Fortress Super Advanced Whey Isolate and Met-Rx MyoSynthesis Whey, they lack Article III standing to pursue claims based on them. Plaintiffs do not claim that these two products caused them any injury. Instead, they say they have standing to bring claims with respect to the products they did not purchase because the products and their labels are substantially similar to Body Fortress Super Advanced Whey Protein—the product plaintiffs did purchase—and its label.

---

[2] Jurisdiction arises under the Class Action Fairness Act, because: minimal diversity exists between the parties (plaintiff Porter is a citizen of Illinois, plaintiff Kwon is a citizen of New York, and defendants are citizens of New York and Delaware); the total number of members of the class is greater than 100; and the amount in controversy exceeds $5,000,000. *See* 28 U.S.C. § 1332(d)(2)(A).

They ask in the alternative that the standing inquiry be deferred until class certification is decided.

Plaintiffs cannot establish an injury-in-fact caused by products plaintiffs did not purchase and so there is no case or controversy with respect to these products. Their attempt to bypass the standing requirements fails, as those requirements are an "irreducible minimum." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 590 (1992). Plaintiffs cite to decisions from district courts in other circuits allowing consumer-fraud claims based on substantially similar products to survive until at least class certification. *See*, e.g., *Quinn v. Walgreen Co.*, 958 F.Supp.2d 533, 542 (S.D.N.Y. 2013); *Davidson v. Kimberly-Clark Corp.*, C 14-1783 PJH, 2014 WL 3919857, at *7 (N.D. Cal. Aug. 8, 2014). But those cases are not instructive, because they do not engage an Article III analysis. The decision as to whether plaintiffs may bring claims on behalf of absent class members should indeed be deferred until the class certification stage. However, plaintiffs cannot bypass the "irreducible minimum" of Article III's standing requirements by using the class-action mechanism. "[A] named plaintiff cannot acquire standing to sue by bringing his action on behalf of others who suffered injury which would have afforded them standing had they been named plaintiffs; it bears repeating that a person cannot predicate standing on injury which he does not share." *Payton v. County of Kane*, 308 F.3d 673, 682 (7th Cir. 2002) (quoting *Allee v. Medrano*, 416 U.S. 802, 828–29 (1974) (Burger, C.J., dissenting)). Plaintiffs' claims as to the two products they did not purchase, Body

Fortress Super Advanced Whey Isolate and Met-Rx MyoSynthesis Whey, are therefore dismissed without prejudice.

2.     *Applicable State Laws*

Defendants also argue that plaintiffs do not meet the injury-in-fact requirement with respect to the laws of states in which they do not reside and did not buy the products at issue. Porter lives in Illinois, and Kwon lives in New York. They made their purchases in those states. Count I alleges a violation of the consumer fraud statutes of those two states, as well as California, Florida, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, and Washington. Counts V and VI also allege state-law claims. Defendants argue that plaintiffs lack standing to bring claims under the laws of any states other than Illinois and New York, and seek dismissal of those claims.

Plaintiffs request that the standing inquiry be postponed until after class certification is decided. They argue that, because the only dispute as to standing arises from plaintiffs' attempt to bring claims on behalf of a multistate class, class certification is logically antecedent to standing and should be decided first. *See Payton*, 308 F.3d at 680. Plaintiffs may not be able to pursue claims under the laws of states in which they do not reside and did not purchase defendants' products, but the presence of these claims does not offend Article III. The parties agree that plaintiffs have Article III standing to bring their individual claims—their claimed injury is traceable to defendants and redressable. Whether plaintiffs can bring claims under their "preferred legal theory has nothing to do with subject-matter

8

jurisdiction." *Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 536 (7th Cir. 2011). Plaintiffs may lack prudential standing to pursue claims under the laws of other states, plaintiffs might not have claims on the merits of other states' laws (because these plaintiffs cannot meet the elements required under other state statutes), and plaintiffs might not be adequate class representatives, but these are not Article III problems. The propriety of these plaintiffs pursuing multi-state classes can be revisited at a later stage, but the motion to dismiss is denied with respect to Article III standing.

### B. Regulatory Compliance

The Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.*, as amended by the Nutrition Labeling and Education Act, imposes certain labeling requirements on foods. For example, food labels may not be "false or misleading." 21 U.S.C. § 343(a)(1). Section 343(q) of the act requires food labels to bear nutrition information, including the amount of total fat, total carbohydrates, total protein, and other nutrients contained in each serving size or other unit of measure of the food. 21 U.S.C. § 343(q)(1)(D). And § 343(r) states that if a food label expressly or implicitly characterizes the level of certain nutrients (e.g., protein) in a product, it must comply with additional requirements. 21 U.S.C. § 343(r).

The act also contains a preemption provision, which prohibits states from establishing "any requirement for nutrition labeling of food that is not identical to the requirement of section 343(q) of this title" or "any requirement respecting any claim of the type described in section 343(r)(1) of this title, made in the label or

labeling of food that is not identical to the requirement of section 343(r) of this title." 21 U.S.C § 343-1(4)–(5). The phrase "not identical to" means "that the State requirement directly or indirectly imposes obligations or contains provisions concerning the composition or labeling of food [that] . . . [a]re not imposed by or contained in the applicable provision (including any implementing regulation) . . . or [d]iffer from those specifically imposed by or contained in the applicable [federal regulation]." 21 C.F.R. § 100.1(c)(4). Thus, to the extent that plaintiffs bring claims under state laws that impose requirements in addition to, or that differ from, those in the applicable federal statute (or in its implementing regulations), the preemption provision mandates dismissal. *See Turek v. Gen. Mills, Inc.*, 662 F.3d 423, 426 (7th Cir. 2011); *see also Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982) ("Federal regulations have no less pre-emptive effect than federal statutes."). But state-law claims based on conduct that violates federal requirements escape preemption. *Turek*, 662 F.3d at 426.

Defendants seek dismissal of some of plaintiffs' consumer fraud claims based on preemption. They argue that the label of its product Body Fortress Super Advanced Whey Protein complies with federal regulations, and that no state-law claim can be based on conduct in compliance with those regulations.[3] Plaintiffs agree that their claims survive only if premised on violations of the federal regulations, and insist that such violations exist. Specifically, plaintiffs argue that

---

[3] Defendants concede that plaintiffs' state-law claims based on allegations of miscalculated Daily Value percentages listed on the back label are not preempted, because the alleged conduct—failing to use the alternative testing method to calculate the Daily Value percentage—violates federal regulations. *See* [39] at 11 n.1.

10

the product's label does not comply with 21 CFR §§ 101.9(c)(7), 101.13(i)(3), and 101.18. To the extent that plaintiffs plausibly allege a violation of federal regulations, preemption is not an obstacle to plaintiffs' state-law claims.

1.   *21 C.F.R. §§ 101.9(c)(7) and 101.13(i)(3) – False or Misleading Protein Claims*

The parties dispute whether the front-label statement, "60g Premium Protein," complies with 21 C.F.R. §§ 101.9(c)(7) and 101.13(i)(3). The latter regulation prohibits false or misleading statements about the amount of a nutrient in a product and the former requires the nutrition-information label to state the total amount of protein, expressed to the nearest gram, contained in the food. 21 C.F.R. §§ 101.9(c)(7), 101.13(i)(3). The regulations permit manufacturers to calculate the total amount of protein by multiplying the product's nitrogen content by a factor of 6.25. *See* 21 C.F.R. § 101.9(c)(7) ("Protein content may be calculated on the basis of the factor 6.25 times the nitrogen content of the food . . . ."). This is how defendants arrived at the values stated on the front (60g) and back labels (60g per serving size). [30] ¶¶ 44, 47, 50–51. Defendants argue that if the regulations permit the protein-content statements on the labels, then they cannot be false or misleading, and no state-law claim can proceed on a theory that would require a different statement than the one permitted by the federal regulations.

But § 101.9(c)(7) also refers to another method of calculating protein content. The regulation requires that for any product making a protein claim (everyone agrees that defendants' product makes such a claim: "60g Premium Protein"), the product must contain a statement of protein content as a percentage of the Daily

11

Reference Value calculated using the "corrected amount of protein"—an amount that is not calculated by simply multiplying the amount of nitrogen by 6.25, but by taking into account the "protein quality value," or "protein digestibility-corrected amino acid score." *See* 21 C.F.R. § 101.9(c)(7)(ii). So for a product like Body Fortress Super Advanced Whey Protein, protein content *may* be calculated using the nitrogen method, but it also *must* be stated as a percentage of the Daily Reference Value using the corrected amount of protein. This alternative to the nitrogen method is only required in the statement of percentage; it is not required for statements of absolute protein content.[4] But even if a product is not required to state protein content in grams as calculated by the digestibility-corrected method, it would not violate federal regulations to use that method. Plaintiffs' theory would not require a label that is inconsistent with federal regulations—defendants could have stated protein content on the front label (particularly when expressing a claim about its "premium" quality) by using the corrected amount. Moreover, the regulations implicitly acknowledge that the nitrogen method is not the most accurate way to describe protein content.

---

[4] The statement that the product contained 60 grams of protein per serving size, contained in the nurtrition information box, was based on the nitrogen multiplication method, and the federal regulations expressly permit this statement. Plaintiffs cannot proceed on a claim that would compel a different statement of grams per serving size in the nutrition information box. Plaintiffs' arguments for the alternative, digestibility-corrected statement of protein content focus only on the statement of protein content on the front label and the Daily Value percentage on the back label. *See* [40] at 11 ("If Defendants had used the required [alternative] method, the 'spiking' ingredients Defendants add to their Products would not have contributed to the final calculated protein content placed on the Products' front display panels, or used to calculate the Percent Daily Value.") (emphasis omitted).

Because defendants were required to calculate the corrected amount of protein (so they could comply with the protein-claim regulation), they knew that the statement "60g Premium Protein" was not accurate. This is sufficient to state a claim that the front-label statement is false or misleading within the meaning of § 101.13(i)(3). *See Gubala v. CVS Pharmacy, Inc.*, No. 14-CV-9039, 2016 WL 1019794, *12 (N.D. Ill. Mar. 15, 2016). Defendants argue that plaintiffs' interpretation of the regulations would result in inconsistent labeling—the product would permissibly state that it contained 60 grams of protein per serving size in the nutrition information box and something less than 60 grams according to the front label. But defendants' interpretation would result in inconsistent labeling, as well, because they agree that the Daily Value percentage on the back label of the product must be calculated using the digestibility-corrected method. Plaintiffs plausibly allege that defendants failed to account for the protein quality in making the front-label statement, resulting in the type of false or misleading statement prohibited by § 101.13(i)(3).

The rest of the statements on the label plausibly demonstrate that defendants recognize the distinction between protein and non-protein amino acids and, as plaintiffs allege, use the term "protein" interchangeably with "whey protein." *See* [30] ¶ 55. For example, plaintiffs allege that the term "protein" in the label's statement, "Branch chain amino acids from protein," refers to whey protein in particular, because free-form amino acids do not contain branched chain amino acids. [30] ¶ 59. To the extent that the product's label states the amount of a

13

particular type of protein (e.g., whey protein), it is not governed by § 101.9(c)(7), which addresses statements relating to the total amount of protein in a product. So even though the label complies with federal regulations when it states a protein content of 60 grams in the nutrition information box, the front-label statement may be false and misleading in that it suggests the product contains 60 grams of whey protein. Thus, plaintiffs' claims are not preempted; they are based on the theory that the label violates federal regulations.

### 2.     21 C.F.R. § 101.18(b) – Misleading Ingredients

Plaintiffs claim that the name of the product, Body Fortress Super Advanced Whey Protein, violates 21 C.F.R. § 101.18(b) by misleading consumers into believing that the only type of protein contained in the product is whey protein. Section 101.18(b) provides that "[t]he labeling of a food which contains two or more ingredients may be misleading by reason (among other reasons) of the designation of such food in such labeling by a name which includes or suggests the name of one or more but not all such ingredients, even though the names of all such ingredients are stated elsewhere in the labeling." Defendants believe any claim related to the name of the product is either preempted or fails as a matter of law, because plaintiffs do not allege that they were misled into believing that the product does not contain any non-protein amino acids, and because the label prominently displays other ingredients in the product, such as vanilla flavoring and crystalline taurine.

14

I agree with *Gubala v. CVS*, 2016 WL 1019794 at *12. As in that case, plaintiffs here have adequately alleged that "Whey Protein Powder" is "misleading in that it suggests that the protein in the Product is comprised exclusively of pure whey protein, as opposed to whey protein mixed with other non-protein substances." *CVS*, 2016 WL 1019794 at *12. Defendants correctly point out that plaintiffs' ingredient claim overlaps significantly with their protein-content claim, but I conclude that both escape preemption for the same reasons—they both allege a misleading statement and it would not be inconsistent with federal labeling requirements to provide truthful ingredient or protein-content statements. Plaintiffs plausibly allege that the label's usage of the terms "protein" and "whey protein" might mislead consumers into believing that those words refer only to "whey protein," when they may also include non-protein ingredients. The motion to dismiss is therefore denied with respect to plaintiffs' consumer fraud claims.

## C.    Breach of Express Warranty

Under both the UCC and Illinois law, a plaintiff "buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." *Connick v. Suzuki Motor Co., Ltd.*, 174 Ill.2d 482, 492 (1996); U.C.C. § 2-607; 810 ILCS 5/2-607(3)(a). New York law imposes the same requirement. *See* N.Y. U.C.C. Law § 2-607(3)(a). Plaintiffs allege that plaintiffs' counsel served defendants with such pre-suit notice in the form of a letter, attaching that letter to the complaint. *See* [30] ¶ 121; [30-1] at 22. However, as defendants point out, plaintiffs' counsel sent that letter on behalf of a nonparty,

Dalton Becky, "and a class of all similarly situated purchasers of Body Fortress Protein Powder." [30-1] at 22. Defendants argue that the letter does not provide sufficient notice, because it does not specify that it was sent on plaintiffs' behalf and does not explicitly identify the product at issue. Plaintiffs respond that the letter provided notice of their claims on behalf of the entire class, and that sufficiency of the notice is a question of fact that cannot be decided on a motion to dismiss.

Plaintiffs' claims for breach of express warranty are dismissed because, despite their arguments to the contrary, plaintiffs do not allege that they provided defendants with pre-suit notice. They allege that someone else did, and they give no information on where that person bought the product or his relationship to plaintiffs. Plaintiffs cite to two cases for the proposition that sufficiency of pre-suit notice is usually a question of fact reserved for the jury. *See In re Rust-Oleum Restore Mktg., Sales Practices & Products Liab. Litig.*, 155 F.Supp.3d 772, 801 (N.D. Ill. 2016); *Maldonado v. Creative Woodworking Concepts, Inc.*, 296 Ill.App.3d 935, 940 (3d Dist. 1998). But the sufficiency of notice is not an issue if plaintiffs do not allege notice in the first place. The letter here was no notice at all because it was not from plaintiffs. One purpose of the pre-suit notice requirement is to facilitate settlement of the buyer's claim. *See Connick*, 174 Ill.2d at 495 ("[W]here the breach has not resulted in personal injury, the UCC indicates a preference that the breach be cured without a lawsuit."); U.C.C. § 2–607 cmt. 4 ("The notification which saves the buyer's rights under this Article need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal

16

settlement through negotiation."). Plaintiffs' failure to notify defendants of the breach defeats that purpose—defendants did not know that these plaintiffs contested a transaction. Accordingly, the breach of warranty claims are dismissed.

### D. Unjust Enrichment

Defendants argue that plaintiffs' claim for unjust enrichment under New York law should be dismissed, because it is duplicative of the consumer fraud claims. This argument relies on the general principle that equitable remedies like unjust enrichment are unavailable when plaintiffs have an adequate remedy at law. *See Samiento v. World Yacht Inc.*, 10 N.Y.3d 70, 81 (2008). Relying on that same principle, the New York Court of Appeals has explicitly limited the use of the claim:

> "[U]njust enrichment is not a catchall cause of action to be used when others fail. It is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff. Typical cases are those in which the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled."

*Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777, 790 (2012). In other words, "[a]n unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." *Id*. Plaintiffs' unjust enrichment claim is based on the same allegations that serve as the bases for their claims under New York General Business Law §§ 349 and 350—defendants deceived plaintiffs using misleading labeling. Plaintiffs cannot prevail on their unjust enrichment claim without also meeting the elements of their statutory claims. "To the extent that these claims succeed, the unjust enrichment claim is duplicative; if plaintiffs' other

claims are defective, an unjust enrichment claim cannot remedy the defects." *Corsello*, 18 N.Y.3d at 791. Because plaintiffs have not shown how their claim for unjust enrichment differs from their statutory claims, the unjust enrichment claim is dismissed.

## IV. Conclusion

Defendants' motion to dismiss, [37], is granted in part. Plaintiffs' unjust enrichment claim under New York law and their breach of express warranty claims are dismissed, as are any claims relating to products they did not purchase.

ENTER:

_____

Manish S. Shah
United States District Judge

Date: 11/28/2016