**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RYAN PORTER and HAARIN KWON, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 15-cv-11459 |
| v. | ) ) | Judge Manish S. Shah |
| NBTY, INC., UNITED STATES NUTRITION, INC., HEALTHWATCHERS (DE), INC., and MET-RX NUTRITION, INC., | ) ) ) ) ) | Magistrate Judge Young B. Kim |
| Defendants. | ) | |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

William A. Delgado (admitted *pro hac vice*)
Megan O'Neill (admitted *pro hac vice*)
Justin T. Goodwin (admitted *pro hac vice*)
DTO LAW
555 West 5th Street, 35th Floor
Los Angeles, CA 90013
213-335-6999

Robert M. Andalman (Atty. No. 6209454)
Rachael Blackburn (Atty. No. 6277142)
A&G Law LLC
542 South Dearborn Street, 10th Floor
Chicago, IL 60605
312-341-3900

Attorneys for Defendants

## **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     RELEVANT FACTUAL BACKGROUND ......................................................... 2

      A.      Defendants Formulated a Quality Product That Benefited Consumers. ................ 2

      B.      During the Class Period, the Product Had Different Labels and Different
           Formulations. ........................................................................................................ 3

      C.      Plaintiffs' Motion Mischaracterizes the Evidence ................................................ 6

III.    ARGUMENT ....................................................................................................... 6

      A.      Plaintiffs Have Not Met All of the Requirements of Rule 23 ................................ 6

           1.      Individualized Inquiries Regarding Materiality and Causation,
                Predominate Over Common Questions of Law. .......................................... 7

           2.      Plaintiffs' Underfill Damages Model Further Illustrates Why Common
                Issues Do Not Predominate in this Unmanageable Class. ........................ 11

           3.      Plaintiffs' Damages Expert Failed to Conduct the Analysis Required
                for a False Advertising Case. .................................................................... 15

           4.      Kwon's Request for Statutory Damages Under New York Law Further
                Impedes Certification. ............................................................................... 17

      B.      Certification of a Multistate Class Is Inappropriate For Additional Reasons. ...... 19

           1.      The Court Lacks Personal Jurisdiction Over the Claims of Out-of-State
                Class Members Who Are Not Present. ..................................................... 19

           2.      Certification of a Multistate Class Would Be Improper For Other
                Reasons. ................................................................................................... 21

                a.      There Are No Plaintiffs from States Other Than Illinois or New
                     York. ............................................................................................. 22

                b.      Contrary to Plaintiffs' Assertions, There Are Material Differences
                     in State Laws in the Multistate Class Proposed. ........................... 23

IV.     CONCLUSION .................................................................................................. 24

# **TABLE OF AUTHORITIES**

## Cases

*Ackerman v. Coca-Cola Co.*, 2013 WL 7044866 (E.D.N.Y. 2013) ................................................ 8

*Algarin v. Maybelline, LLC*, 300 F.R.D. 444 (S.D. Cal. 2014) ..................................................... 11

*Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228 (2013) ....................................................... 7

*Am. Health & Resource Ctr. Ltd. v. Alcon Labs., Inc.*, 16-cv-04539, Dkt. No. 190  (N.D. Ill.
    June 15, 2018) (Durkin, J.) ........................................................................................... 19

*Ault v. J.M. Smucker Co.*, 310 F.R.D. 59 (S.D.N.Y 2015) .......................................................... 14

*Bristol-Myers Squibb v. Sup. Ct.*, — U.S. —, 137 S. Ct. 1773 (2017) .................................. 19, 21

*Caro v. Procter & Gamble Co.*, 18 Cal. App. 4th 644 (Cal. App. 1993) ................................. 8, 23

*Cattie v. Wal-Mart Stores, Inc.*, 504 F. Supp. 2d 939 (S.D. Cal. 2007) ...................................... 23

*Chernus v. Logitech, Inc.*, 2018 WL 1981481 (D.N.J. Apr. 27, 2018) ........................................ 20

*Cmty. Bank of Trenton v. Schnuck Mkts. Inc.*, 887 F.3d 803 (7th Cir. 2018) ............................... 8

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ............................................................... 7, 11, 16

*Corcoran v. CVS Health Corp.*, 2016 WL 948880 (N.D. Cal. Mar. 14, 2016) ........................... 22

*DeBernardis v. NBTY, Inc.*, 2018 WL 461228 (N.D. Ill. Jan. 18, 2018) ...................................... 21

*Dix v. Am. Bankers Life Assur. Co. of Fla.*, 429 Mich. 410 (1987) ............................................. 24

*Fairbanks v. Farmers New World Life Ins. Co.*, 197 Cal. App. 4th 544, *as modified* (Aug. 1,
    2011) ............................................................................................................................ 9

*Gasser v. Kiss My Face, LLC*, 2018 WL 4538729 (N.D. Cal. Sept. 21, 2018) ........................... 20

*Gen. Tel. Co. of S.W. v. Falcon*, 457 U.S. 147 (1982) .................................................................. 7

*Hardy v. Bed Bath & Beyond, Inc.*, 2018 WL 1272687 (S.D. Fla. Mar. 9, 2018) ...................... 24

*Himber v. Intuit, Inc.*, 2012 WL 4442796 (E.D.N.Y. Sep. 25, 2012) .......................................... 17

*Hughes v. Ester C Co.*, 317 F.R.D. 333 (E.D.N.Y. 2016 ............................................................. 16

*In re 5-Hour Energy Mktg. & Sales Practices Litig.*, 2017 WL 2559615 (C.D. Cal. Jun. 7,
    2017) ...................................................................................................................... 8, 16

*In re Asacol Antitrust Litig.*, 907 F.3d 42 (1st Cir. 2018) ............................................................. 13

*In re Avon,* 2015 WL 5730022 (S.D.N.Y. Sep. 30, 2015) ............................................................. 15

*In re Bridgestone/ Firestone, Inc.*, 288 F.3d 1012 (7th Cir. 2002) ................................... 21, 22, 24

*In re Clorox Consumer Litig.*, 301 F.R.D. 436 (N.D. Cal. 2014) .................................................. 18

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, No. 09 CV 3690, 2013 WL
4506000 (N.D. Ill. Aug. 23, 2013) (Dow, J.) ...................................................................... 22

*In re IKO Roofing Shingle Prods. Liab. Litig.*, 757 F.3d 599 (7th Cir. 2014) ............................ 15

*In re POM Wonderful LLC*, 2014 WL 1225184 (C.D. Cal. Mar. 25, 2014) ................................. 15

*In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712 (S.D.N.Y. 2017) (Rakoff, J.) ............... 22

*In re Subway Footlong Sandwich Mktg. & Sales Practices Litig.*, 869 F.3d 551 (7th Cir.
2017) ................................................................................................................................ 9

*In re Trans Union Corp. Privacy Litig.*, 211 F.R.D. 328 (N.D. Ill. 2002) (Gettleman, J.)........... 18

*Jones v. ConAgra Foods, Inc.*, 2014 WL 2702726 (N.D. Cal. June 13, 2014) ....................... 8, 15

*Karhu v. Vital Pharm., Inc.*, 621 F. App'x 945 (11th Cir. 2015) ................................................. 13

*Klay v. Humana, Inc.*, 382 F.3d 1241 (11th Cir. 2004) ............................................................... 19

*Langendorf v. Skinnygirl Cocktails, LLC*, 306 F.R.D. 574 (N.D. Ill. 2014) ................................... 7

*Legge v. Nextel Commc'ns, Inc.*, 2004 WL 5235587 (C.D. Cal. Jun. 25, 2004) ......................... 19

*LeSage v. Norwest Bank Calhoun-Isles, N.A.*, 409 N.W.2d 536 (Minn. Ct. App. 1987) ............. 24

*Liston v. King.com, Ltd.*, 254 F. Supp. 3d 989 (N.D. Ill. 2017) (Tharp, J.) ................................. 22

*Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012) ................................................. 23

*Mullins v. Direct Digital, LLC*, 795 F.3d 654 (7th Cir. 2015) ..................................................... 14

*Mulvania v. Sheriff of Rock Island Cty.*, 850 F.3d 849 (7th Cir. 2017) ......................................... 7

*Murray v. GMAC Mortg. Corp.,* 434 F.3d 948 (7th Cir. 2006) ................................................... 19

*Mussat v. IZVIA Inc.,*, 2018 WL 5311903 (N.D. Ill. Oct. 26, 2018) (Keldall, J.) ....................... 20

*Oshana v. Coca-Cola Co.*, 472 F.3d 506 (7th Cir. 2006) ............................................................. 9

*Pagan v. Abbott Labs., Inc.*, 287 F.R.D. 139 (E.D.N.Y. 2012) .................................................. 17

*Practice Mgmt. Support Servs. v. Cirque du Soleil*, 301 F. Supp. 3d 840 (N.D. Ill. 2018) (Durkin, J.) ...................................................................................................... 19, 20, 21

*Ratner v. Chem. Bank N.Y. Trust Co.*, 54 F.R.D. 412 (S.D.N.Y. 1972) ...................................... 18

*Segovia v. Vitamin Shoppe, Inc.*, 2017 WL 6398747 (S.D.N.Y. 2017) ........................................ 8

*Shady Grove Orthopedic Assocs. v. Allstate Ins.*, 559 U.S. 393, 445 (Ginsburg, J., dissenting) ............................................................................................................... 18

*Smith v. Bayer Corp.*, 564 U.S. 299 (2011). ............................................................................... 20

*Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750 (7th Cir. 2014) ............................................. 11, 22

*Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742 (7th Cir. 2008) ........................................... 22

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ................................................................. 7

*Wasser v. All Market, Inc.*, 329 F.R.D. 464 (S.D. Fla. 2018) .................................................... 15

*Weiner v. Snapple Beverage Corp.*, 2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010) ................. 9, 15

*Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180 (9th Cir. 2001) ................................ 11

**Statutes**

Cal. Civ. Code § 1782 .................................................................................................................. 23

Mass. Gen. Laws ch. 93A, § 9(3) ............................................................................................... 23

N.J. Stat. Ann. § 56:8-20 ............................................................................................................. 23

N.Y. Gen. Bus. Law § 349 ........................................................................................................... 17

## I.   <u>INTRODUCTION</u>

Plaintiffs Ryan Porter and Haarin Kwon ("Plaintiffs") would like this Court to believe that class certification in this matter is a straightforward affair. It is anything but. Rather, Plaintiffs seek to certify a ten-state class that, for some states, spans nearly a decade. During that time, the low-cost Product at issue featured 48 different label variations and four different formulations. If anything, Plaintiffs have presented the poster child of a case where certification should be denied because of the overarching need for millions of individualized inquiries, such that the prerequisites of Rule 23 cannot be met.

Try as they might, Plaintiffs cannot escape the need for individualized hearings on the threshold questions of causation and injury: whether each putative class member would have made a different purchasing decision absent the allegedly false statement. Notably, Plaintiffs did not even bother to make this inquiry in the consumer survey they conducted—a survey which *also* fails to address materiality on a classwide basis. Compounding these problems is the sheer unmanageability of this particular class action where, to establish liability and damages, *each* class member must specifically identify which formulation of the Product they purchased *each* time—an impossible task that could be accomplished accurately only by remembering both the product number and a tiny label revision code from the Product's UPC box.

Other Rule 23 prerequisites are likewise unmet. As set forth in Defendants' *Daubert* motion, Plaintiffs' damages model fails the *Comcast* requirement that the model be tied to the theory of liability. Instead of determining how the Product's market price is driven by its different ingredients and attributes so that the true "price premium" (if any) associated with the challenged statements could be rigorously determined, Plaintiffs instead perform an elementary-school-level arithmetic calculation untethered to the evidence presented.

These facts establish that *no* class should be certified, but Plaintiffs' request for a *multi-state* class hits additional barriers. First, this Court must determine whether it has personal jurisdiction over the claims of absent class members from states other than Illinois. (It does not.) And, even if it could adjudicate such claims, the material differences among the state laws in the proposed multi-state class preclude a determination on the common issue of liability in "one fell swoop," which Rule 23 requires.

Of course, the Court need not reach any of these issues if it grants Defendants' contemporaneously filed Motion for Summary Judgment ("MSJ"), either on preemption or other grounds. But, if it does reach the question of class certification, the Court should deny Plaintiffs' motion for the reasons herein.

## II.     RELEVANT FACTUAL BACKGROUND

### A.     Defendants Formulated a Quality Product That Benefited Consumers.

During the relevant time period, Defendants manufactured and sold the Body Fortress Super Advanced Whey Product (the "Product"), a whey protein supplement combined with amino acid ingredients that can help serious athletes with performance and recovery. Scott Decl. ¶ 3. Though the Product contained only whey protein when it was first sold, Defendants realized they could reformulate the product to provide their customers with additional physiological benefits. Cornacchiulo Decl. ¶ 3. The same consumers who were purchasing protein also were separately purchasing other supplements such as creatine, glutamine, and taurine to assist with their workout regimen. So, Defendants reformulated the Product to include whey protein *and* these additional, beneficial ingredients, changing the name of the product to "Super Advanced Whey Protein" and touting this added "Super Recovery Blend" on the label. *Id*.; *see also*

Cornacchiulo Dep. at 81:8-82:13, 110:22-111:7 (Ex. MMM).[1]  In accordance with applicable federal regulations, Defendants accurately determined the total protein in the Product using the Kjedahl (i.e., nitrogen content) method and advertised the total protein in the Product as either 52 grams or 60 grams, depending on the particular formulation of the Product at issue.  Rendall Dep. at 145:24-146:8, 179:9-180:3 (Ex. LLL); *see* also Exs. A-WW.

Commencing in September 2013, in response to feedback from both customers and industry associations, Defendants voluntarily reformulated their Product to contain 60 grams of whey protein and 9 grams of the Super Recovery Blend.  Scott Decl. ¶ 5.  By July 2014, *before* any lawsuit had been filed against them, Defendants started selling the reformulated product.  Plaintiffs' Ex. 11 (showing first ship date for Formulation 5 in July 2014).  Plaintiffs do not allege that the reformulated Product (Formulations 5 and 6) violates any law.

**B.**     **During the Class Period, the Product Had Different Labels and Different Formulations.**

In their motion for class certification, Plaintiffs gloss over the fact that both the formulation of the Product and its label changed substantially over the class period.  Between September 2009 and July 2014, four different formulations and 48 different labels were used for five different flavors of the Product.  *See* Plaintiffs' Ex. 11; Scott Decl. ¶¶ 7-55, Exs. A-WW (attaching all labels).  The formulations differed in the following respects:

| Formulation | Serving Size | Whey Protein | Super Recovery Blend (Amino Acids) |
|---|---|---|---|
| First | 33 grams | 17 grams | 9 grams |
| Second | 34 grams | 20 grams | 6 grams |
| Third | 38 grams | 20 grams | 6 grams |
| Fourth | 42 grams | 20 grams | 10 grams |

Plaintiffs' Ex. 3.

---

[1]     These new ingredients were added in an amount that would be beneficial to consumers.  *See* Expert Report of Guoyao Wu at 12-23 (Ex. DDD).

Furthermore, different labels touted different benefits. For example, some labels specifically called out the presence of a 100% whey blend[2] and glutamine in the Product (Ex. A), while others did not (Ex. KK).




Some representations appeared on the labels of multiple Product formulations, making it impossible to use these statements to identify which formulation was purchased. *See, e.g.*, Ex. A (Formulation 1 label with "100% Premium Whey Protein"); Ex. I (Formulation 2 label with "100% Premium Whey Protein"). Moreover, the mix of representations that appeared on the labels within the same formulation changed over time. *See* Ex. M (Formulation 2 label *without* the "100% Premium Whey" representation). And while there may be (*very slight*) differences between the last label used for Formulation 2 (*id*.) and the label used for Formulation 3 (Ex. GG), no consumer under ordinary purchase conditions would be able to discern them.[3]

Further, the same UPC Code (the 12-digit alphanumeric code and associated barcode

---

[2]   The label on the left makes clear that the *whey blend* in the product was comprised of 100% whey. All versions of the label also make clear that the Product, in its entirety, is comprised of both a whey blend *and* free amino acids so that the Product, in its entirety, could not be comprised of only 100% whey.

[3]   Plaintiff may argue that the labels used for Formulation 4 are distinct because Formulation 4 offered 60 grams of protein whereas Formulations 1-3 only offered 52 grams of protein. This argument ignores that Formulation 5 (which is **not** at issue) also offers 60 grams plus 9 grams of the Super Recovery Blend, such that the statement "60 grams" on the label does not allow unique identification of Formulation 4. *See* Ex. YY.

used to scan consumer products) was used for each of Formulations 1 through 4, making it impossible to use the UPC Code (or third party services like Nielsen and IRI that use point-of-sale scan data, derived from UPC codes, to track sales) to determine which formulation was purchased.[4]  Moreover, existing formulations were not recalled when a new formulation hit the market, so different formulations were available for purchase at the same time.  Scott Decl. ¶ 4.[5]  Ultimately, to *accurately* determine which formulation a consumer actually purchased, one would need to physically examine the Product Number and "label code revision," which appear above the UPC code on the label itself:



Label Code Revision 17O

Product Number 44320

---

[4]    The UPC codes for each Product flavor and formulation appear in Plaintiffs' Exhibit 11.  As an example, the UPC Code 074312443206 was used for Formulations 1-4 of the Chocolate flavor.

[5]    Plaintiffs' counsel provides an excellent example.  Fraietta Decl. ¶ 31.  Counsel purchased a Product made with Formulation 4 in April 2019 despite the fact that (i) Formulation 4 has not been manufactured since July 2014, (ii) Formulation 5 started shipping in July 2014, and (iii) Formulation 6 started shipping in May 2015.  *See* Plaintiff's Ex. 11.

### C.    Plaintiffs' Motion Mischaracterizes the Evidence.

If there is anything false or misleading in this case, it is the way Plaintiffs mischaracterize the evidence.  For example, Plaintiffs claim Defendants have "admitted" they included less protein in Formulations 1 through 4 than the amount advertised on the labels.  Mot. at 23.[6]  Not so.  As explained in Defendants' MSJ, Defendants have always maintained they truthfully advertised the total amount of protein in the Product.  Plaintiffs have not produced any evidence that the total amount of protein advertised on the label was inaccurate under the legally permissible Kjedahl method.

As another example, Plaintiffs claim Cindy Sciortino testified definitively that the Product's label connoted that the Product contained 60 grams of premium *whey* protein (as opposed to 60 grams of protein in general).  Mot. at 10.  In reality, she did not.  *Compare* Ex. III, at 89:11-90:2 *with id*. at 218:17-219:9 ("Q. Is it your interpretation of this label that the product contains 60 grams of 100 percent whey protein? . . .  A. No.") (Ex. III).

Similarly misleading are Plaintiffs' citations to the deposition transcript of Patrick Cornacchiulo.  Mot. at p. 13.  Plaintiffs cite his testimony at transcript page 35 to suggest that consumers understood themselves to be buying 100% whey protein *when they purchased the Product*.  In reality, Cornacchiulo was testifying about an internal marketing study conducted by Defendants reflecting the fact that consumers of the Body Fortress brand were interested in purchasing whey protein *in general*.  Cornacchiulo Dep. at 28:25-35:11 (Ex. MMM).

## III.    ARGUMENT

### A.    Plaintiffs Have Not Met All of the Requirements of Rule 23.

"The class action is 'an exception to the usual rule that litigation is conducted by and on

---

[6]    The fundamental error in Plaintiffs' Motion arises from the fact they treat the term "whey protein" as interchangeable with the term "protein," but that is not the case.  While all "whey protein" is "protein," not all "protein" is "whey protein."

behalf of the individual named parties only.'" *Comcast Corp. v. Behrend*, 569 U.S. 27, 33

(2013) (citation omitted).  Rule 23 does not "establish an entitlement to class proceedings for

the vindication of statutory rights," but rather "imposes stringent requirements for certification

that in practice exclude most claims."  *Am. Express Co. v. Italian Colors Rest*., 570 U.S. 228,

234 (2013).  In reviewing a motion for class certification, the Court must conduct a "rigorous

analysis" of the facts and law to determine whether the plaintiff has met its burden of

demonstrating compliance with *all* requirements of Rule 23.  *Gen. Tel. Co. of S.W. v. Falcon*,

457 U.S. 147, 161 (1982).  "Plaintiffs have the burden of demonstrating that the requirements of

Rule 23 are met."  *Mulvania v. Sheriff of Rock Island Cty.*, 850 F.3d 849, 859 (7th Cir. 2017)

(citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).

1.   <u>Individualized Inquiries Regarding Materiality and Causation,<br>Predominate Over Common Questions of Law</u>.

      This Court is familiar with the exacting predominance inquiry:

> Although similar to commonality, the predominance criterion is far
> more demanding.  To satisfy it, the plaintiff must show that
> questions of law or fact common to class members predominate
> over any questions affecting only individual members.  Fed. R.
> Civ. P. 23(b)(3).  I must compare the role of common issues of law
> and fact with the role of individual issues, and consider whether it
> would be necessary to examine individual transactions to decide
> whether there is liability on individual claims…. Predominance is
> not satisfied if resolving a common issue will not greatly simplify
> the litigation to judgment or settlement ....  If the class certification
> only serves to give rise to hundreds or thousands of individual
> proceedings ... it is hard to see how common issues predominate or
> how a class action would be the superior means to adjudicate the
> claims.

*Langendorf v. Skinnygirl Cocktails, LLC*, 306 F.R.D. 574, 581-82 (N.D. Ill. 2014) (internal

quotations and citations omitted) (Shah, J.).  Here, Plaintiffs' proposal would lead to the

"hundreds or thousands" of individual proceedings that Rule 23 seeks to avoid because

individualized inquiries related to materiality/causation abound.

7

Materiality/causation turns on whether a consumer would have refused to purchase the product absent the allegedly false representation.[7] *Ackerman v. Coca-Cola Co.*, 2013 WL 7044866, at *18 (E.D.N.Y. 2013) (recommending denial of certification of damages class under NY statute, as "loss causation must be addressed individually" based on "what [each consumer] would have opted to do, but for defendant's misrepresentations"); *Segovia v. Vitamin Shoppe, Inc.*, 2017 WL 6398747 (S.D.N.Y. 2017) (granting summary judgment to defendant in case involving protein supplements where, *inter alia*, there was no evidence "that but for [the challenged] claims, [plaintiff] would have been unwilling to pay Defendant's price"); *Cmty. Bank of Trenton v. Schnuck Mkts. Inc.*, 887 F.3d 803 (7th Cir. 2018) (relying on Illinois Supreme Court opinion which held that "plaintiffs in a class action" under the ICFA "must prove that 'each and every consumer who seeks redress actually saw and was deceived by the statements in question'").

Because there may be multiple reasons a consumer buys a product, materiality/causation must be assessed in light of other potential motivating factors. *Jones v. ConAgra Foods, Inc.*, 2014 WL 2702726, at *15 (N.D. Cal. June 13, 2014) (noting the need to "to assess whether the challenged statements were in fact material to purchases, as opposed to, or in addition to, price, promotions, retail positioning, taste, texture or brand recognition")[8]; *see also In re 5-Hour Energy Mktg. & Sales Practices Litig.*, 2017 WL 2559615, at *8 (C.D. Cal. Jun. 7, 2017)

---

[7]  Some courts consider the "would the plaintiff have acted differently" inquiry to be an inquiry into materiality. *Caro v. Procter & Gamble Co.*, 18 Cal. App. 4th 644, 668 (Cal. App. 1993) ("Stated in terms of reliance, materiality means that without the misrepresentation, the plaintiff would not have acted as he did."). Others consider it an inquiry into loss causation. *See Ackerman*, 2013 WL 7044866, at *18. Either way, because Plaintiffs here must prove both materiality and loss causation, thousands if not millions of individualized inquiries would have to take place.

[8]  Defendants' survey expert here, Dr. Dominique Hanssens, was an expert in *Jones*, and the court relied on his opinion.

("Absent a consumer survey or other market research to indicate how consumers reacted to the [challenged] statements, and how they valued these statements compared to other attributes of the product and the [relevant] market generally, Plaintiffs have not offered sufficient evidence of materiality across the class.").

Where different consumers would have attached different import to the challenged representation or other product attributes, individual hearings would be required, making class certification improper. *In re Subway Footlong Sandwich Mktg. & Sales Practices Litig.*, 869 F.3d 551, 554 (7th Cir. 2017) ("In addition, the element of materiality—a requirement for a damages claim under most state consumer-protection statutes—was an insurmountable obstacle to class certification. Individualized hearings would be necessary to identify which customers, if any, deemed the minor variation in bread length material to the decision to purchase."); *Weiner v. Snapple Beverage Corp.*, 2010 WL 3119452, at *11 (S.D.N.Y. Aug. 5, 2010) ("The record in this case, including the plaintiffs' own testimony, shows that consumers may have purchased Snapple beverages for many reasons other than the 'All Natural' label, including their taste, glass bottles, quirky advertising, or even the 'Snapple Facts.'"); *Fairbanks v. Farmers New World Life Ins. Co.*, 197 Cal. App. 4th 544, 565–66, *as modified* (Aug. 1, 2011) (no common proof of materiality where many surveyed consumers indicated their purchasing decision would be unaffected by knowledge of the alleged misrepresentation); *cf. Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006) (noting, in affirming denial of class certification, that "[s]ome people may have bought fountain Diet Coke *because* it contained saccharin, and some people may have bought fountain Diet Coke *even though* it had saccharin. Countless members of Oshana's putative class could not show any damage, let alone damage proximately caused by Coke's alleged deception.").

9

Here, Plaintiffs have presented zero evidence that the operative question—whether, but for the allegedly false representation, consumers would have been willing to buy the Product at its stated price—can be resolved on a classwide basis. Although Plaintiffs offer Dr. Dennis' survey in an attempt to answer that question, as explained in Defendants' *Daubert* motion, the Dennis survey answers an altogether different question: what type of product a consumer would most *prefer* to buy, **not** whether a consumer would *forego* purchasing the Product absent the allegedly false representations. Defs' *Daubert* Mot. at 5-9. Nor did Dr. Dennis ask any questions intended to determine whether other factors, such as price, brand, taste, etc., drove the purchasing decision. That omission was curious because lead Plaintiff Porter testified that his decision as to which protein supplement to buy was driven almost exclusively by **price**. Porter Dep. at 21:13-22:22 (testifying that "[y]ou know, once I found out about the benefits of whey protein, then I would buy it on price," and "[o]nce I started purchasing these products, [$20] was usually where the sales price was at and that's the one that got my business") (Ex. FFF).

Meanwhile, Defendants' survey expert, Dr. Hanssens, designed a survey that actually investigated whether the alleged misrepresentation affected consumer behavior as well as the myriad reasons why consumers purchased the Product. To accomplish this, Dr. Hanssens presented consumers with labels for two different products: one label actually used by Defendants during the class period and one label that was similar *but modified* as Plaintiffs contend it should have been (i.e., it disclosed only 40 grams of whey protein instead of 52 g or 60 g). Hanssens Expert Report at 22 (Ex. BBB). Not only did Dr. Hanssens' survey establish that there was no classwide proof of materiality (*id.* at 22-23), it also identified the different reasons why people (including *actual* Body Fortress consumers who participated in the survey) buy protein supplements. Those reasons include flavor, price, efficacy, quality, and brand,

among others.  *Id*. at 21.  Indeed, lead Plaintiff Porter himself testified that "price" was his most important consideration in selecting a protein product, while Plaintiff Kwon testified that "the purity of the protein" was his primary consideration and that "price doesn't matter."  Porter Dep. at 34:11-19 (Ex. FFF); Kwon Dep. at 57:8-58:19, 73:6-10 (Ex. GGG).  The *quantity* of protein per serving did not make the cut.

As set forth above, where there is no evidence that materiality/causation can be shown on a classwide basis and multiple reasons exist as to why a product is purchased, individual inquiries—not common questions—will predominate, and class certification is improper. *Algarin v. Maybelline, LLC*, 300 F.R.D. 444, 459 (S.D. Cal. 2014) ("Given the number of individual purchasing inquiries as well as the evidence showing materiality and reliance varies consumer to consumer, it is evident that common issues do not predominate.").[9]

### 2. Plaintiffs' Underfill Damages Model Further Illustrates Why Common Issues Do Not Predominate in this Unmanageable Class.[10]

Without a proper damages model, Plaintiffs "cannot show Rule 23(b)(3) predominance: Questions of individual damage calculations will inevitably overwhelm questions common to the class."  *Comcast,* 569 U.S. at 34.  Furthermore, even if a defendant's conduct involves a "common nucleus of facts," "[i]f each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, a class action is not 'superior.'"  *Zinser v. Accufix Research Institute, Inc*., 253 F.3d 1180, 1192 (9th Cir. 2001)

---

[9]  *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750 (7th Cir. 2014) is not to the contrary.  *Suchanek* stands for the proposition that certification may be appropriate in some cases despite the existence of individualized issues of causation but that, ultimately, the district court "must decide whether classwide resolution would substantially advance the case."  *Id*. at 761.  Here, Plaintiffs have not shown that *any* issue is susceptible to classwide resolution, so it is difficult to see how certification would *substantially* advance the case.

[10]  Though the report of Plaintiffs' expert, Colin Weir, proposed three different models— underfill, illegal sales, and unjust enrichment—Plaintiffs' motion makes clear they are only pursuing the first theory.  Thus, this opposition focuses on the underfill model.

(citations omitted).  As discussed above, this case requires individual hearings to determine materiality/causation.  Plaintiffs' proposed "underfill" damages model hits yet another barrier.

Here, Plaintiffs have not even attempted to put forth a damages model that satisfies the predominance requirement.  Putting aside that each consumer would have to accurately recall how many units of the Product they purchased over a series of years and how much they paid each time, both damages experts agree that damages are formulation-dependent; that is, purchasers of different formulations of the Product would be entitled to different damages. Further, as Defendants' expert, Dan Garrett, opines, some class members—those who purchased Formulations 2 and 4—would not be entitled to damages at all.  Garrett Report at 7-8 (Ex. AAA).  Consequently, this Court faces the very problem *Comcast* anticipates: that individual damages calculations will overwhelm common issues.

And how would these individual damages be calculated?  Pursuant to Rule 23(b)(3)(D), Plaintiffs had to propose a manageable way to identify class members and the specific product formulations they purchased.  But no such method exists.  As explained above, the only accurate way to determine which formulation was purchased is to consult the product number and label code revision from the UPC box on each label of a purchased Product.  With that in mind, Plaintiffs' proposals can be evaluated.

First, Plaintiffs conjecture that issues of identification and manageability can be resolved by relying on information from loyalty card programs.  Not so.  Most sales took place at Walmart (*see, e.g.*, Cornacchiulo Dep. at 38:1-4 (Ex. MMM)) which has no loyalty card program and, therefore, no way to identify class members, let alone their specific purchases. *See* Plaintiffs' Ex. 30.  Consumer-identifying information from Amazon may be available, but *formulation* information is not.  *See* Plaintiffs' Ex. 28.  And Ahold just provided a "data dump"

for *all* Body Fortress branded products sold at Ahold starting at some point in 2012, including products that are not at issue. Delgado Decl. ¶ 3. Moreover, these records contain only UPC information which, as noted above, does not inform which formulation was purchased. *See* Plaintiffs' Ex. 27.

A proposal for self-authentication, via declaration or some other method, fares no better. As a preliminary matter, whether self-authentication can or should be employed at all is now a matter of some debate. *See In re Asacol Antitrust Litig.*, 907 F.3d 42, 53 (1st Cir. 2018); *Karhu v. Vital Pharm., Inc.*, 621 F. App'x 945, 948 (11th Cir. 2015). More importantly, self-authentication in *this particular* case would put consumers to an impossible task. First, consumers would have to recall whether they purchased the Body Fortress Super Advanced Whey Protein Product (at issue) *or* the Body Fortress Super Advance Whey Isolate Product (not at issue), both of which have labels that look remarkably alike:

 vs. 

Second Amended Complaint ¶¶ 50, 52.

Then consumers would have to recall how many units they purchased and how much they paid each time. And, even if they could remember that they purchased the Product and the details of those purchases, class members would, **according to both damages experts**, have to recall and identify the *specific formulation* they purchased. To do so accurately, they would either have to have in their possession the label itself (an extreme unlikelihood) or somehow

13

recall the product number and alphanumeric label code revision on top of the UPC code (a complete impossibility).[11]  This, therefore, is not a run-of-the-mill consumer protection case \merely presenting the ordinary vagaries of consumers' memory; it is the "unusually difficult" case where accurate recollection is nigh impossible—which, as the Seventh Circuit has recognized, "may well cause the plaintiff to flunk" Rule 23's superiority requirements.  *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 672 (7th Cir. 2015).

In fact, Defendants' expert, Dr. Alan Castel, an expert in the field of memory, has detailed why it would be impossible for consumers to accurately recall the type of information that would be requested in this case through the process of self-authentication.[12]  But Dr. Castel's testimony, while extremely useful, is merely icing on the cake.  To prove their point, Defendants can simply point to the deposition testimony of Porter, a repeat purchaser of the Product, who could not recall with any precision the label on the Products he purchased (much less a label code revision).  *See* Porter Dep. at 80:20-23, 81:6-8, 99:9-24, 103:18-104:8, 105:5-25 (Ex. FFF).  Courts throughout the country have denied certification on similar facts.  *See, e.g, Ault v. J.M. Smucker Co.*, 310 F.R.D. 59, 66 (S.D.N.Y 2015) ("Permitting potential class members to self-

---

[11]  It appears Plaintiffs' damages expert, Mr. Weir, determined the total amount of sales of each formulation in the aggregate by using sales and manufacture dates as a proxy for label code information.  That was improper.  As the Fraietta Declaration makes clear, one cannot use the date of sale to determine which formulation was purchased because multiple formulations were in the market at the same time.  Fraietta Decl. ¶ 31 (detailing purchase of Formulation 4, last manufactured in 2014, *five years later* in April 2019).

[12]  Plaintiffs retained Dr. Joel Steckel to rebut Dr. Castel.  If anything, Dr. Steckel's answers confirmed Dr. Castel's opinion that people cannot remember details, particularly about recurring events or even product names.  *See* Steckel Dep. at 37:5-14 (erroneously referring to the Super Advanced Whey *Isolate* product as "Whey *Imulite*," and explaining that he at least "knew it began with an I"); *see also, e.g., id*. at 7:7-20, 11:21-12:3, 31:20-32:3, 32:4-8, 32:11-17, 34:20-35:11, 46:6-12, 47:6-10, 53:11-17, 67:10-12, 68:20-22 (all instances in which Dr. Steckel testified he could not "recall" or "remember") (Ex. NNN).

identify would require them to specifically recall each variety of Crisco cooking oil they purchased during the class period," but "[w]ho could possibly recall that level of detail six years (or more) later?"); *Jones*, 2014 WL 2702726, at *10 ("[T]hat there are seven varieties of PAM, some of which bore the '100% Natural' label and some of which did not, and that two of the products bearing the '100% Natural' label stopped bearing that label in 2010, makes it all the less likely that a consumer would accurately remember whether he had been exposed to the label."); *Weiner*, 2010 WL 3119452, at *13 (finding that because "class members are unlikely to remember accurately every Snapple purchase during the class period," "soliciting declarations from putative class members regarding their history of Snapple purchases would invite them to speculate, or worse."); *Wasser v. All Market, Inc.*, 329 F.R.D. 464, 475 (S.D. Fla. 2018) ("Numerous courts have recognized the issues inherent in requiring class members to accurately recall specific information about purchases of low-cost consumer goods"); *In re Avon,* 2015 WL 5730022 (S.D.N.Y. Sep. 30, 2015); *In re POM Wonderful LLC*, 2014 WL 1225184, at *6 (C.D. Cal. Mar. 25, 2014).

3.   Plaintiffs' Damages Expert Failed to Conduct the Analysis Required for a False Advertising Case.

As discussed, *supra*, Plaintiffs' damages model destroys predominance as it provides for a different damages calculation for every single putative class member.  It faces a second problem, however, insofar as it is untethered to Plaintiffs' theory of liability.  *In re IKO Roofing Shingle Prods. Liab. Litig.*, 757 F.3d 599 (7th Cir. 2014) (requiring that damages theory match theory of liability).

As Defendants explain in their *Daubert* motion, none of Weir's damages models accounts for the market value of *any* ingredient or product attribute other than the number of grams of whey protein.  Defs' *Daubert* Mot. at 19-25.  Contrary to the case law and market data,

Weir did not attribute any value to the ingredients in the Super Recovery Blend, even though five such ingredients—creatine, glycine, L-glutamine, L-threonine, and taurine—are each packaged and sold as stand-alone products with dosing that is comparable to the amount contained in a serving of the Product. *See id.* at 20-22. Nor did Weir account for the contribution of any other product attribute to the market price paid by consumers, such as the Product's brand, market position, purity, look, feel, mixability, or taste. *See id.* at 23-24. While Weir *could* have used marketplace data to calculate a price premium for the Product resulting specifically from the alleged misrepresentation, he eschewed that scientific approach in favor of simplistic arithmetic.

Weir's method in this case stands in sharp contrast to his representations in other false advertising cases, where he conceded that a proper damages calculation requires a rigorous assessment of the but-for market price—not rote arithmetical calculation. For example, in one case, Weir testified that "[t]he price of the Product, and any *price premium* resulting from the [challenged claim] is set by the marketplace," and thus "the question [with respect to damages] is how much less would consumers *have paid* for the Products" in that "marketplace" absent the challenged claims. Ex. YYY. Likewise, Weir testified in another case that damages in a deceptive-labeling case are "the difference between the market price of the Products and a measure of the market price that would exist but for the [challenged claims]." Ex. XXX.

In any event, because the measure of damages in a deceptive labeling case must account for the full value of the product notwithstanding the challenged claim, Plaintiffs' proposed damages model fails to "measure only those damages attributable to [the plaintiffs'] theory." *Comcast*, 569 U.S. at 35; *see also, e.g.*, *Hughes v. Ester C Co.*, 317 F.R.D. 333, 356 (E.D.N.Y. 2016) (rejecting Weir's damages model because it failed to "take into account the value of the product [P]laintiffs received"); *In re 5-Hour Energy*, 2017 WL 2559615, at *10 (rejecting Weir's

"underfill" model that failed to sufficiently "account for the 'value' received from the other ingredients in [challenged supplement], such as caffeine, folic acid, B6, and sucralose," where he merely "adjust[ed] the 'underfilled' amount by the *cost* of these other ingredients" without accounting for the additional *value* those ingredients provided to consumers); Defs' Daubert Mot. at 19-25. Thus, whether analyzed under *Daubert* or Rule 23, Plaintiffs' proposed damages models cannot support class certification.

4.    <u>Kwon's Request for Statutory Damages Under New York Law Further Impedes Certification.</u>

The potential availability of statutory damages under New York's consumer protection laws (N.Y. Gen. Bus. Law §§ 349–50) does not solve these problems. Plaintiffs' proposed "statutory damages" model likewise fails under *Comcast* because it would not limit recovery to those class members who are eligible to recover damages under the statute. The statute provides that only a "person who has [(1)] <u>been injured</u> [(2)] <u>by reason of</u> any violation of this section may . . . recover" any damages, statutory or otherwise. N.Y. Gen. Bus. Law § 349 (emphasis added). In other words, statutory damages are not available to a class member who cannot establish both causation and actual injury; the mere availability of statutory damages as a potential remedy *once a claim has been proven* cannot be used to bootstrap these showings. *See Pagan v. Abbott Labs., Inc.*, 287 F.R.D. 139, 148 (E.D.N.Y. 2012) ("The existence of a minimum amount of statutory damages does not assist the Plaintiffs in overcoming the hurdle of affirmatively demonstrating commonality, because … Plaintiffs need to first show that the class members have [actually] been injured or harmed in the same way[.]"); *Himber v. Intuit, Inc.*, 2012 WL 4442796, *9 (E.D.N.Y. Sep. 25, 2012) ("Although statutory damages are available under Sections 349 and 350, those provisions do not dispense with the requirement of harm and standing.").

17

As explained above, Plaintiffs cannot prove causation here without undertaking individual inquiries because the Product bore multiple labels touting different benefits throughout the class period, and different consumers attached different import to the challenged representation and other product attributes. Yet Plaintiffs' model purports to award statutory damages for every single unit of the Product sold in New York, irrespective of whether the purchaser can prove causation and injury. *See* Weir Report at ¶¶ 27-30 (Ex. UUU). Because Plaintiffs have not proposed a method of calculating class-wide statutory damages only for those consumers who purchased the Product in New York and were injured *because of* the challenged representation, their model fails under *Comcast* and cannot support certification. *See, e.g.*, *In re Clorox Consumer Litig.*, 301 F.R.D. 436, 447 (N.D. Cal. 2014) (denying certification of claims under sections 349 and 350 where plaintiffs produced no evidence as to which class members saw which representations or could prove causation and injury).

Furthermore, where, as here, statutory damages are grossly disproportionate to actual damages[13] and could lead to devastating impact—in contravention of a legislature's express desire—a statutory-damages class action is not a "superior" method of adjudication. *See Shady Grove Orthopedic Assocs. v. Allstate Ins.*, 559 U.S. 393, 445 n.3 (Ginsburg, J., dissenting) (noting that district courts have "considerable discretion … to refuse to certify a class" on superiority grounds where plaintiff seeks "statutory damages" far exceeding any "actual damages" (citing *Ratner v. Chem. Bank N.Y. Trust Co.*, 54 F.R.D. 412, 416 (S.D.N.Y. 1972)); *In re Trans Union Corp. Privacy Litig.*, 211 F.R.D. 328 (N.D. Ill. 2002) (Gettleman, J.) (finding class action was not superior based on "the disproportionality of a [massive statutory] damage

---

13    If, roughly speaking, each New York consumer is entitled to 33% of the purchase price (approximately $18) in actual damages, actual damages would be $6, and the $500 statutory award under GBL § 350 would be **83 times** actual damages.

award that has little relation to the harm actually suffered by the class, and … the due process concerns attended upon such an impact"); *see also Legge v. Nextel Commc'ns, Inc.*, 2004 WL 5235587 (C.D. Cal. Jun. 25, 2004); *Klay v. Humana, Inc.*, 382 F.3d 1241, 1271 (11th Cir. 2004).[14]

      **B.**    **Certification of a Multistate Class Is Inappropriate For Additional Reasons.**

For the reasons detailed above, no class should be certified as a result of Plaintiffs' failure to meet the requirements of Rule 23. But their request to certify a *multi-state* class hits additional barriers as well.

      1.    The Court Lacks Personal Jurisdiction Over the Claims of Out-of-State Class Members Who Are Not Present.

As the Court may recall, in July 2017, Defendants moved to dismiss the claims of out-of-state class members for lack of personal jurisdiction in light of *Bristol-Myers Squibb v. Sup. Ct.*, — U.S. —, 137 S. Ct. 1773 (2017) ("*BMS*"). Dkt No. 62. While the Court agreed with the application of *BMS* to this case, it held that Defendants had waived their personal jurisdiction defense by not raising it earlier because *BMS* was merely an outgrowth of existing law, not a change in law. Since then, however, other courts facing the same question in this District have held to the contrary: *Bristol-Myers* was an unanticipated change in law, and defendants should therefore be permitted to raise it even where they did not argue lack of personal jurisdiction at the outset. *See, e.g.*, *Practice Mgmt. Support Servs. v. Cirque du Soleil*, 301 F. Supp. 3d 840, 863-64 (N.D. Ill. 2018) (Durkin, J.); *Am. Health & Resource Ctr. Ltd. v. Alcon Labs., Inc.*, 16-

---

[14]  *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948 (7th Cir. 2006), and its progeny are not to the contrary. Though *Murray* suggests that a district court need not worry about constitutionally excessive damages until after trial, that opinion explicitly rests on the premise that it is up to the legislature to craft statutes (and worry about excessive damages), while judges simply enforce the statute. Here, though, the New York Legislature has spoken—it did *not* want statutory damages available to consumer classes, precisely for reasons of fairness and excessiveness. *See* MSJ at 20-21.

cv-04539, Dkt. No. 190 at *8-9 (N.D. Ill. June 15, 2018) (Durkin, J.); *Mussat v. IQVIA Inc.*,

2018 WL 5311903, *2-3 (N.D. Ill. Oct. 26, 2018) (Kendall, J.). Thus, it would be appropriate

for this Court to reconsider its earlier decision on the applicability of *BMS*.

      Furthermore, in no case could Defendants have waived their personal jurisdiction defense

as to the out-of-state *absent* members of the putative class—whether they hail from New York or

any of the other eight states as to which certification is sought. While defendants are required to

assert jurisdictional defenses vis-à-vis *named* parties in a Rule 12 motion or their answer, no

authority requires defendants to assert any defenses to *absent* putative class members' claims at

the pleadings stage. After all, putative class members are not "parties" in any sense of the word

unless and until class certification is granted. *See Smith v. Bayer Corp.*, 564 U.S. 299, 314

(2011). Thus, courts routinely defer ruling on standing or jurisdiction as to absent class

members, finding such matters premature prior to motion practice on class certification. *See,

e.g., Practice Mgmt.*, 301 F. Supp. 3d at 863-64 (finding, in ruling on class certification, that

*Bristol-Myers* created a newly available defense, such that there was no waiver, but also noting

that, in any event, the "unnamed, nonresident class members were not even parties to the

litigation until now" for waiver purposes); *Chernus v. Logitech, Inc.*, 2018 WL 1981481, *8

(D.N.J. Apr. 27, 2018) ("At this stage of litigation, no class has been certified, and therefore, to

determine whether this Court has specific jurisdiction over Defendant with respect to the claims

of the unnamed class members prior to class certification would put the proverbial cart before the

horse."); *Gasser v. Kiss My Face, LLC*, 2018 WL 4538729, *2 (N.D. Cal. Sept. 21, 2018)

("Given that it is premature to raise a personal jurisdiction issue as to putative class members

[until a class is certified], …. the issue of whether Plaintiffs can and/or should represent

consumers [from other states] is an issue to be raised at class certification.").[15]

Thus, irrespective of any previous determination on the issue of waiver as to Kwon himself, the time is ripe to examine whether this Court can assert personal jurisdiction over the claims of the out-of-state absent class members, whom Plaintiffs now seek to make parties to this action. As explained in Defendants' motion to dismiss (Dkt. No. 63), it cannot. *BMS*, 137 S. Ct. at 1781; Ex. ZZ, at 3:7-8 (indicating that this Court "agree[d] on the merits with application of *BMS* to this case"). While plaintiffs often seize on the dissent in *BMS* to question whether *BMS* applies in class action lawsuits, courts in this District have properly concluded it does so apply because the Rules Enabling Act forbids use of the Federal Rules of Civil Procedure (including Rule 23) to "abridge or modify" Defendants' substantive due process rights under the Fourteenth Amendment. *See, e.g., Practice Mgmt.*, 301 F. Supp. 3d at 861 ("[T]he Fourteenth Amendment's due process clause precludes nonresident plaintiffs injured outside the forum from aggregating their claims with an in-forum resident. [. . .] Under the Rules Enabling Act, a defendant's due process interest should be the same in the class context."); *see also DeBernardis v. NBTY, Inc.*, 2018 WL 461228, at *2 (N.D. Ill. Jan. 18, 2018).[16]

       2.    <u>Certification of a Multistate Class Would Be Improper For Other Reasons.</u>

Jurisdiction aside, the problems of certifying multi-state classes have long been recognized: "No class action is proper unless all litigants are governed by the same legal rules." *In re Bridgestone/ Firestone, Inc.*, 288 F.3d 1012, 1015 (7th Cir. 2002). Thus, where "state laws about theories. . . presented by [] plaintiffs differ," "the class cannot satisfy the commonality and

---

[15]   Indeed, in ruling on Defendants' earlier Motion to Dismiss, this Court noted that "[t]he propriety of these plaintiffs pursuing multi-state classes can be revisited at a later stage[.]" Dkt. No. 49 at p. 9.

[16]   The Seventh Circuit may address the applicability of *BMS* to class actions in *Mussat v. IQVIA*, Case No. 19-2104, where the issue has been fully briefed.

superiority requirements of Fed. R. Civ. P. 23(a), (b)(3)." *Id.* Another "downside" is "the tendency, when the claims in a federal class action are based on state law, to undermine federalism." *Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742, 745 (7th Cir. 2008). While "[d]ifferences across states may be costly for courts and litigants alike, . . . they are a fundamental aspect of our federal republic and must not be overridden in a quest to clear the queue in court." *Bridgestone/Firestone*, 288 F.3d at 1020.

        a.    *There Are No Plaintiffs from States Other Than Illinois or New York.*

Many courts have concluded that certification of a multi-state class turns on the participation of at least one representative plaintiff from each state. *See, e.g., In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, No. 09 CV 3690, 2013 WL 4506000, at *8 (N.D. Ill. Aug. 23, 2013) (Dow, J.) ("[The] Indirect Purchaser Plaintiffs fail to satisfy their burden of showing Article III standing for states in which they do not reside and/or did not purchase the products at issue."); *Corcoran v. CVS Health Corp.*, 2016 WL 948880, at *12 (N.D. Cal. Mar. 14, 2016) ("Courts routinely dismiss claims where no plaintiff is alleged to reside in a state whose laws the class seeks to enforce."); *In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 727 (S.D.N.Y. 2017) (Rakoff, J.) ("[E]ach state law claim must be accompanied by a named plaintiff who has suffered an injury under that state's statute…."); *cf. Liston v. King.com, Ltd.*, 254 F. Supp. 3d 989, 1001 (N.D. Ill. 2017) (Tharp, J.) ("Whether one views the question of Liston's legal authority to pursue a claim under the law of a state where he did not reside and was not injured as a question of standing, or substantive law, or typicality and adequacy under Rule 23, there is plainly ample reason at this juncture to question whether Liston will be able to pursue claims based on statutory causes of action created by states where Liston neither lived nor was injured."); *compare Suchanek,* 764 F.3d at 754-55 (certification of eight state class

where there were eight plaintiffs, one from each state); *Saltzman v. Pella Corp.*, Case No. 06-04481, Dkt. No. 540 (N.D. Ill.) (Seventh Amended Complaint lists plaintiffs from seven states).

Here, there are two named plaintiffs—one from New York and one from Illinois—yet they seek to assert state law claims on behalf of absent class members for states where (i) they did not live at the time of purchase or (ii) they did not purchase the Product. As the foregoing cases explain, that is impermissible.

> b. *Contrary to Plaintiffs' Assertions, There Are Material Differences in State Laws in the Multistate Class Proposed.*

Plaintiffs gloss over numerous material differences among the applicable laws of the states for which they seek to certify a multistate class. Most notably, unlike the other states, California requires a plaintiff pursuing a deceptive labeling claim to prove that he *actually relied* on the challenged representations. *Cattie v. Wal-Mart Stores, Inc.*, 504 F. Supp. 2d 939, 946 (S.D. Cal. 2007) (citing *Caro,* 18 Cal. App. 4th at 668). Plaintiffs incorrectly contend that this reliance requirement applies only to the named plaintiff. Not so here. While class-wide reliance may be inferred where it is undisputed that all class members saw the same representations, *no* inference of class-wide reliance may be drawn where, as here, "there is no evidence that the allegedly false representations were *uniformly* made to *all* members of the proposed class." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 595 (9th Cir. 2012).

Other differences abound. California and Massachusetts, for example, both require a putative plaintiff to provide pre-suit notification, while New Jersey requires a prospective plaintiff mail the complaint to the Attorney General. *See* Cal. Civ. Code § 1782; Mass. Gen. Laws ch. 93A, § 9(3); N.J. Stat. Ann. § 56:8-20. But Plaintiffs have submitted no evidence that Porter or Kwon provided any pre-suit notification either to Defendants or to the New Jersey Attorney General. Given that citizens of these states would lack statutory standing to file a state

23

law claim absent such notification, there is no reason why two *non*-citizens should be excused from this requirement. To hold otherwise would raise significant federalism concerns. *See Bridgestone/Firestone*, 288 F.3d at 1020.

The relevant state laws also differ with respect to whether they require some form of scienter (and which type),[17] the applicable statute of limitations,[18] and the remedies available.[19] While Plaintiffs note that differing statutes of limitations and remedies do not by themselves defeat certification, when taken together with these other differences and the requisite individualized inquiries already discussed, they represent further reasons why common issues of law and fact do not predominate here. *See* Section III.A., *supra*.

## IV. CONCLUSION

Because Plaintiffs have failed to meet their burden of demonstrating that they meet all of the requirements of Rule 23, class certification must be denied.

---

[17] Michigan law requires proof of "a defendant's intent to deceive through a pattern of misrepresentations*." Dix v. Am. Bankers Life Assur. Co. of Fla.*, 429 Mich. 410, 418 (1987). Minnesota law requires proof a defendant's intent that others rely on the challenged representation. *LeSage v. Norwest Bank Calhoun-Isles, N.A.*, 409 N.W.2d 536, 539 (Minn. Ct. App. 1987). Other states have no scienter requirement.

[18] As Plaintiffs acknowledge, the applicable statutes of limitations vary between 3, 4, 5, and 6 years, depending on the state. *See* Ex. 16.

[19] Plaintiffs also acknowledge that the remedies available vary considerably from state to state. Florida, Illinois, and Minnesota, for example, do not permit punitive or treble damages, while Massachusetts, Michigan, New Jersey, and New York do to varying degrees. *See* Ex. 16. Further, under Florida law, a consumer who could have received a full refund of the money spent on a challenged product lacks standing to pursue a claim under Florida's Deceptive and Unfair Trade Practices Act. *Hardy v. Bed Bath & Beyond, Inc.*, 2018 WL 1272687, at *2 (S.D. Fla. Mar. 9, 2018).

Respectfully submitted,

NBTY, INC., UNITED STATES NUTRITION,
INC., HEALTHWATCHERS (DE), INC., and
MET-RX NUTRITION, INC.

By:   /s/ Robert M. Andalman             
           One of their attorneys

William A. Delgado *(admitted pro hac vice)*
Megan O'Neill *(admitted pro hac vice)*
Justin T. Goodwin *(admitted pro hac vice)*
DTO LAW
555 W. 5th Street, 35th Floor
Los Angeles, CA 90013
Tel.: (213) 335-6999

Robert M. Andalman (Atty. No. 6209454)
Rachael Blackburn (Atty. No. 6277142)
A&G LAW LLC
542 S. Dearborn St., 10th Floor
Chicago, IL 60605
Tel.: (312) 348-7629
Attorneys for Defendants

## CERTIFICATE OF SERVICE

I, Robert M. Andalman, hereby certify that on May 17, 2019, I caused to be electronically filed the foregoing **DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** which will be served electronically on all registered parties of record.


  /s/ Robert M. Andalman