**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RYAN PORTER and HAARIN KWON, individually and on behalf of all others similarly situated, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 15-cv-11459 |
| | ) | |
| v. | ) | Hon. Manish S. Shah |
| | ) | |
| NBTY, INC., UNITED STATES NUTRITION, INC., HEALTHWATCHERS (DE), INC., and MET-RX NUTRITION, INC., | ) ) ) | Hon. Young B. Kim |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO EXCLUDE THE OPINIONS OF MICHAEL DENNIS, WILLIAM
CAMBPELL, AND COLIN WEIR UNDER *DAUBERT* AND FEDERAL RULES OF
EVIDENCE 403 AND 702**

Philip L. Fraietta*
*pfraietta@bursor.com*
Frederick J. Klorczyk III*
*fklorczyk@bursor.com*
**BURSOR & FISHER, P.A.**
888 Seventh Avenue
New York, New York 10019
Phone: 646.837.7150
Fax: 212.989.9163
*Admitted *Pro Hac Vice*

Joseph J. Siprut
*jsiprut@siprut.com*
Michael M. Chang
*mchang@siprut.com*
**SIPRUT PC**
17 N. State Street
Suite 1600
Chicago, Illinois 60602
Phone: 312.236.0000
Fax: 312.878.1342

Nick Suciu III
*nicksuciu@bmslawyers.com*
**BARBAT, MANSOUR & SUCIU PLLC**
1644 Bracken Rd.
Bloomfield Hills, Michigan 48302
Phone: 313.303.3472

*Attorneys for Plaintiffs
and the Proposed Classes*

## TABLE OF CONTENTS

PAGE(S)

INTRODUCTION .................................................................................................................1

PLAINTIFFS' AFFIRMATIVE EXPERT OPINIONS.....................................................1

    A.    Summary Of Dr. Dennis' Opinions ................................................1

    B.    Summary Of Dr. Campbell's Opinions............................................2

    C.    Summary Of Mr. Weir's Opinions ..................................................3

LEGAL STANDARD .........................................................................................................4

ARGUMENT .......................................................................................................................5

I.    DR. DENNIS' OPINIONS ARE RELEVANT AND WILL ASSIST THE
JURY ......................................................................................................................5

    A.    Dr. Dennis' Survey Is Relevant To And Probative Of Whether The
Protein Content Claim Was Material To Class Members ......................5

    B.    Dr. Dennis' Survey And Opinions Are Methodologically Sound ..........7

        1.    Matrix Tables Are The Industry-Standard For Creating
Hypothetical Marketplaces In Stated Preference Surveys.........7

        2.    There Is No Such Thing As A Control Group In Stated
Preference Surveys Such As Dr. Dennis' ..................................9

        3.    Dr. Dennis Correctly Surveyed Respondents Who Were
Representative Of Body Fortress' Target Market....................10

        4.    Dr. Dennis' Opinions Are Not Unfairly Prejudicial.................12

II.    DR. CAMPBELL'S OPINIONS ARE RELEVANT AND WILL ASSIST
THE JURY .............................................................................................................12

    A.    Dr. Campbell's Opinion That The NPNs That Comprise The SRB
Are Not Protein Is Uncontroverted ....................................................12

    B.    Dr. Campbell's Opinion About The Value Of The SRB Is
Admissible ...........................................................................................13

        1.    Dr. Campbell Properly Considered The Only Advertised
Benefit Of The SRB – Recovery .............................................13

        2.    Dr. Campbell's Opinion Is Not Contrary To Comcast............14

        3.    Defendants Do Not Identify Any Purported Benefits That Dr.
Campbell Neglected To Consider ............................................16

        4.    Exclusion Under Rule 403 Is Inappropriate.............................17

    C.    There Is No Analytical Gap Between Dr. Campbell's Opinions
And The Data He Cites ........................................................................17

III.   MR. WEIR'S OPINIONS ARE RELEVANT AND WILL ASSIST THE
       JURY ....................................................................................................................21

      A.   Mr. Weir's Underfill Damages Methodology Is Admissible ..............................21

           1.   Mr. Weir's Underfill Damages Methodology Is Not
              Derivative Of Dr. Campbell's Opinion That The SRB Is
              Worthless .................................................................................21

           2.   Mr. Weir's Reply Report Moots Defendants' Criticisms.........................21

           3.   Defendants' Remaining Criticisms Of Mr. Weir's Underfill
              Methodology Fail .....................................................................22

      B.   Mr. Weir's Statutory Damages Model Is Uncontested .......................................24

CONCLUSION.............................................................................................................................25

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Black & Decker Corp. v. Positec USA Inc.*,
  2015 WL 5612340 (N.D. Ill. Sept. 22, 2015) ........................................................................ 12

*Broomfield v. Craft Brew All., Inc.*,
  2018 WL 4952519 (N.D. Cal. Sept. 25, 2018) ................................................................... 6, 7

*Dzielak v. Whirlpool Corp.*,
  2017 WL 1034197 (D.N.J. Mar. 17, 2017) ..................................................................... 7, 8, 9

*F.T.C. v. Figgie Int'l, Inc.*,
  994 F.2d 595 (9th Cir. 1993) ............................................................................................... 15

*Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*,
  326 F.R.D. 592 (N.D. Cal. 2018) .......................................................................................... 6

*Fond Du Lac Bumper Exchange, Inc. v. Jui Li Enters. Co.*,
  2016 WL 756568 (E.D. Wis. Feb. 26, 2016) ................................................................. 19, 20

*General Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) ..................................................................................................... 17, 18

*Gucci Am., Inc. v. Guess?, Inc.*,
  831 F. Supp. 2d 723 (S.D.N.Y. 2011) ................................................................................. 10

*Guido v. L'Oreal, USA, Inc.*,
  284 F.R.D. 468 (C.D. Cal. 2012) .......................................................................................... 7

*In re 5-Hour Energy Marketing and Sales Practices Litigation*,
  2017 WL 2559615 (C.D. Cal. June 7, 2017) ................................................................. 22, 23

*In re Amla Litig.*,
  328 F.R.D. 127 (S.D.N.Y. 2018) ......................................................................................... 25

*In re POM Wonderful LLC*,
  2014 WL 1225184 (C.D. Cal. Mar. 25, 2014) ................................................................ 15, 16

*In re Scotts EZ Seed Litig.*,
  2017 WL 3396433 (S.D.N.Y. Aug. 8, 2017) ............................................................. 9, 10, 11

*Kurtz v. Kimberly-Clark Corp.*,
  321 F.R.D. 482 (E.D.N.Y. 2017) ......................................................................................... 25

*Lapsley v. Xtek, Inc.*,
    689 F.3d 802 (7th Cir. 2012) ................................................................................5

*Lazaroff v. Paraco Gas Corp.*,
    967 N.Y.S.2d 867 (N.Y. Sup. Ct. 2011) ............................................................25

*Lees v. Carthage College*,
    714 F.3d 516 (7th Cir. 2013) ..............................................................................22

*Manpower, Inc. v. Ins. Co. of Pennsylvania*,
    732 F.3d 796 (7th Cir. 2013) ..............................................................................20

*Martin v. Monsanto Co.*,
    2017 WL 1115167 (C.D. Cal. Mar. 24, 2017) .............................................15, 23

*McCrary v. Elations Co. LLC*,
    2014 WL 12589137 (C.D. Cal. Dec. 2, 2014)..................................... 13, 15, 16

*Medicines Co. v. Mylan Inc.*,
    2014 WL 1257957 (N.D. Ill. 2014) ..................................................................5, 6

*Mednick v. Precor, Inc.*,
    2017 WL 2619139 (N.D. Ill. June 16, 2017) .....................................................16

*Ortiz v. City of Chicago*,
    656 F.3d 523 (7th Cir. 2011) ................................................................................5

*Remy Inc. v. Tecnomatic, S.P.A.*,
    2012 WL 515997 (S.D. Ind. Jan. 25, 2012) ......................................................12

*Sears, Roebuck & Co. v. Menard, Inc.*,
    2003 WL 168642 (N.D. Ill. Jan. 24, 2003) .......................................................12

*Suchanek v. Sturm Foods, Inc.*,
    764 F.3d 750 (7th Cir. 2014) ................................................................................6

*Suchanek v. Sturm Foods, Inc.*,
    2017 WL 3704206 (S.D. Ill. Aug. 28, 2017)...............................................15, 25

*Thakore v. Universal Mach. Co. of Pottstown*,
    670 F. Supp. 2d 705 (N.D. Ill. 2009) ..........................................................21, 22

*United States v. Kemp*,
    2017 WL 2719328 (S.D. Ind. June 23, 2017) .............................................12, 13

*United States v. Kennedy*,
    726 F.3d 968 (7th Cir. 2013) ..............................................................................15

*Wielgus v. Ryobi Tech., Inc.*,
  2012 WL 3614642 (N.D. Ill. Aug. 21, 2012) ........................................................................ 17

**STATUTES**

New York GBL § 349 ........................................................................................... 4, 24, 25

New York GBL § 350 ..................................................................................................... 4

**RULES**

Fed. R. Evid. 702 ................................................................................................ passim

Fed. R. Evid. 703 ................................................................................................ passim

## INTRODUCTION

Plaintiffs hereby oppose Defendants' motion to exclude the opinions of Dr. J. Michael Dennis, Dr. William Campbell, and Mr. Colin B. Weir ("Plaintiffs' Affirmative Experts"). For the reasons stated herein, Plaintiffs' Affirmative Experts' testimonies are admissible.

## PLAINTIFFS' AFFIRMATIVE EXPERT OPINIONS

Plaintiffs proffer three affirmative experts: (1) a consumer survey expert, Dr. J. Michael Dennis; (2) an exercise science expert, Dr. William Campbell; and (3) a damages expert, Mr. Colin B. Weir. A summary of their opinions in this case follows:

### A.   Summary Of Dr. Dennis' Opinions

Dr. Dennis "was asked by Plaintiffs' counsel to design, conduct, and report on a reliable consumer survey to address [two] issues relevant to the litigation." 8/13/18 Declaration and Expert Report of J. Michael Dennis, Ph.D., Dkt. 145 ("Dennis Report") ¶ 15. "First, [Dr. Dennis] was asked to measure the extent to which (if any) that Body Fortress consumers understand the product packaging to communicate that the product contained only whey protein and not contain other sources of protein." *Id.* "Second, [Dr. Dennis] was asked to measure whether the Defendants' misrepresented product packaging was material to the purchase decision of the Body Fortress consumers." *Id.* Dr. Dennis' "survey found that consumers almost unanimously – 95.1% – understood the Body Fortress packaging to communicate that all the protein in a two-scoop serving was sourced from whey protein (either 52 grams or 60 grams, depending upon the packaging." *Id.* ¶ 19. Dr. Dennis' "survey also found that almost 8 out of ten consumers – 79.4% – would prefer to purchase the protein supplement that is sourced exclusively from whey protein over a product that is sourced from both whey and non-whey ingredients." *Id.* ¶ 20. "In short, almost all consumers understood the Defendants' packaging to mean that their Products' protein was sourced exclusively from whey. For almost eight out of

1

ten consumers, the Defendants' misrepresentation of the source of the protein was material to their decision to purchase the product, in [Dr. Dennis'] expert opinion." *Id.* ¶ 21.

### B. Summary Of Dr. Campbell's Opinions

Dr. Campbell "was asked by plaintiffs' counsel to address the following topics:  (1) The Benefits of Whey Protein; (2) Provide a Definition for Protein and Compare the Effectiveness of Protein Against Individual Amino Acids; (3) Methods of Quantifying Protein, Determining Protein Quality, and Product Labeling Implications; and (4) Review the Ingredients Listed in the 'Super Recovery Blend' of Body Fortress and their Potential to Improve Recovery."  8/14/18 Report of Dr. William Campbell, Dkt. 147 ("Campbell Report") at 1.

First, Dr. Campbell opines that "whey protein is ranked as the highest quality protein" and that the "benefits of whey protein consumption include improving cardiometabolic health, body composition, exercise performance, and recovery." *Id.* at 2.

Second, Dr. Campbell opines that "[w]hile amino acids are the building blocks of protein, individual amino acids themselves are not proteins." *Id.* at 4.  Accordingly, "ingestion of complete whey protein is superior to ingestion of individual amino acids." *Id.*

Third, Dr. Campbell opines that "inclusion of any free form amino acids (i.e., leucine, isoleucine, valine, L-glutamine, threonine, glycine) in a dietary supplement … artificially inflates the protein content of the product since free form amino acids are not proteins and are not bound together by peptide bonds." *Id.* at 6.  However, had Defendants utilized the PDCAAS method of quantifying protein, these free form amino acids and other non-protein nitrogen-containing substances (NPNs), such as creatine and taurine, would not artificially inflate the protein content. *Id.* at 6-8; *see also id.* at 8 ("Based on the total protein contained in the product and the PDCAAS score for whey protein, the label incorrectly overstates the total protein and %DV for both one scoop and two scoops.").  Based on Defendants' admissions, Dr. Campbell also states that the

"protein content of the Body Fortress Super Advanced Whey Protein for the first four sets of protein formulations (Exhibit #11) is summarized as follows:"

| Formula | Protein Content Claim on Label (per two scoops) | Actual Protein (per two scoops) | Actual Protein Shortage (per two scoops) |
|---------|------------------------------------------------|--------------------------------|------------------------------------------|
| 1 | 52 grams | 34 grams | 18 grams |
| 2 | 52 grams | 39.4 grams | 12.6 grams |
| 3 | 52 grams | 39.2 grams | 12.8 grams |
| 4 | 60 grams | 39.6 grams | 20.4 grams |

*Id.* at 8.  Finally, echoing Defendants' witness' testimony, Dr. Campbell opines that "[r]ecovery is the process of maximizing adaptations of the exercise stimulus and returning the body to pre-exercise performance levels."  *Id.* at 9.  Dr. Campbell also opines that the dosages of the NPNs that comprise the Super Recovery Blend ("SRB") are insufficient to assist with recovery, and are therefore "worthless."  *Id.* at 9-18.

C.  **Summary Of Mr. Weir's Opinions**

Mr. Weir was "asked by Counsel for Plaintiffs to provide a framework for the calculation of damages and the harm suffered by the Class resulting from Defendants' alleged practice of underfilling the Products."  8/15/18 Declaration of Colin B. Weir, Dkt. 149 ("Weir Report") ¶ 5. For purposes of Plaintiffs' Class Certification Motion, Mr. Weir proposes two damages models.

First, Mr. Weir proposes an "Underfill Damages [model] (wherein consumers would receive the difference in value between the amount of whey protein Defendants promised and the amount of whey protein consumers actually received)."  *Id.* ¶¶ 8, 9-19.  "[T]he total value of Underfill Damages to the Class in this case can be calculated as follows:"

*Total Retail Sales X Underfill Factor = Underfill Damages*

*Id.* ¶ 17.  The "Underfill Factor" in the formula above is the percentage by which each formulation was short on the promised whey protein.  *Id.* ¶ 15.  Using this Underfill Damages

3

model, Mr. Weir calculates damages for each of the four formulations at issue, across the 10 states in Plaintiffs' proposed classes. *Id.* ¶ 19.

While Plaintiffs and Mr. Weir maintain that there is no "economic value to the [SRB] in the amounts contained in Body Fortress," in response to Defendants' and their proffered damages expert Dr. Garrett's criticism that Mr. Weir did not account for the value of the SRB in his Underfill Damages model, Mr. Weir's reply report proposes a modified Underfill Damages model that accounts for any value of the SRB. 12/21/18 Reply Declaration of Colin B. Weir ("Weir Reply Report") ¶ 10. Mr. Weir opines that "the correct method to account for this value would be to subtract the value of the [SRB] from the market price, and then apply the underfill factors to the remaining value of the Whey Protein in the formula below:"

$$(Market\ Price - SRB\ Value)\ X\ Underfill\ Factor = Damages$$

*Id.* Using inputs from Dr. Garrett, Mr. Weir calculates damages for each of the four formulations at issue, across the 10 states in Plaintiffs' proposed classes. *Id.* ¶ 11.

Second, Mr. Weir proposes a "Statutory Damages [model] (wherein New York consumers would receive statutory damages according to New York GBL § 349 and/or New York GBL § 350). Weir Report ¶¶ 8, 27-30. Statutory damages can be calculated as:

$$Number\ of\ Units\ Sold\ X\ Damages\ per\ Violation = Total\ Statutory\ Damages$$

*Id.* ¶ 29. Defendants criticize Mr. Weir for not accounting for the appropriate statute of limitations when calculating statutory damages. According to Dr. Garrett, ███ units of the Product were sold in New York during the applicable statute of limitations. PSOF ¶ 40. In response to that criticism, Mr. Weir "revise[d] his] statutory damages calculations," using Dr. Garrett's ███ units of the Product figure. Weir Reply Report ¶ 31.

## LEGAL STANDARD

"The purpose of the *Daubert* inquiry is to scrutinize proposed expert witness testimony to

4

determine if it has the same level of intellectual rigor that characterizes the practice of an expert in the relevant field so as to be deemed reliable enough to present to a jury. A *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy. If the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012). "The admissibility determination is not intended to supplant the adversarial process, and so even 'shaky' testimony may be admissible." *Ortiz v. City of Chicago*, 656 F.3d 523, 536 (7th Cir. 2011). When a reasonable juror is capable of understanding any defect in an expert's methodology, then those defects go to weight, not admissibility. *Medicines Co. v. Mylan Inc.*, 2014 WL 1257957, at *4 (N.D. Ill. 2014) ("While [plaintiff] challenges [expert witness]'s choice of methodology and doubts his ultimate conclusions, these arguments go to the weight of the expert testimony, not its admissibility").

## ARGUMENT

## I.     DR. DENNIS' OPINIONS ARE RELEVANT AND WILL ASSIST THE JURY

### A.     Dr. Dennis' Survey Is Relevant To And Probative Of Whether The Protein Content Claim Was Material To Class Members

Defendants argue that Dr. Dennis' survey is irrelevant because "it fails to address the central issue for which it is offered: 'whether the misrepresented product packaging was material to the purchase decision of the Body Fortress consumers.'" Defs.' Br. at 5 (quoting Dennis Report ¶ 15) (alterations omitted). That is baseless. Dr. Dennis designed a survey that "provided the respondents an opportunity to make actual product choices between two products that correspond to the Plaintiffs' allegations and the Defendants' position." 12/21/18 Reply Declaration of J. Michael Dennis ("Dennis Reply Report") ¶ 40. That "survey found conclusively that, when presented the Defendants' product packaging, consumers prefer to

5

purchase the product that is entirely sourced from whey protein." *Id.* Specifically, Dr. Dennis found that 95.1% of survey respondents "understood the Body Fortress packaging to communicate that all the protein in a two-scoop serving was sourced from whey protein" and that "almost 8 out of ten consumers – 79.4% – would prefer to purchase the protein supplement that is sourced exclusively from whey protein over a product that is sourced from both whey and non-whey ingredients." *Id.* ¶¶ 19-20. That is probative of materiality. *See Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 602 (N.D. Cal. 2018) ("Even where 'simple language' was used to describe ginger oil, ginger oleoresin, and ginger root, 40.59% of respondents still believed 'Made From Real Ginger' meant that Canada Dry was made using 'ginger root' as its ginger ingredient. … This is still a legally significant percentage of people who would be misled.").[1]

Defendants purport to reject Dr. Dennis' survey because it "offers no evidence as to the reason why any purchaser bought the Product; nor does it provide evidence that the challenged product claims were likely to have influenced purchasing decisions." Defs.' Br. at 6. But that makes no sense. "Plaintiffs need not prove that the alleged misrepresentation is the only material factor to their purchasing decisions to prove materiality…." *Broomfield*, 2018 WL 4952519, at *11. Indeed, "[a]ll of the applicable state consumer protection laws at issue here may be satisfied by proof that a statement is likely to mislead a reasonable consumer, even if the statement is literally true. … Under this reasonable-consumer standard, the plaintiff 'must show that members of the public are likely to be deceived.'" *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 761-62 (7th Cir. 2014); Ex. 16. As such, Defendants are "simply incorrect when [they]

---

[1] Dr. Dennis' findings are consistent with Defendants' internal research during the class period. PSOF ¶¶ 20-25, Exs. 5B, 77. *See Broomfield v. Craft Brew All., Inc.*, 2018 WL 4952519, at *11 (N.D. Cal. Sept. 25, 2018) ("Even if the materiality evidence provided by Dennis were relevant at this stage, the Court finds that Dennis's survey results, in combination with the statements by [Defendant] … are sufficient to raise the common question of whether the misrepresentations were material.").

6

argue[] that the class members' subjective preferences or individual beliefs about the packaging will be at issue. The consumer claims require an *objective* test, asking what the reasonable consumer would believe or think upon exposure to the misleading statement." *Broomfield*, 2018 WL 4952519, at *12 (emphasis in original); *Guido v. L'Oreal, USA, Inc.*, 284 F.R.D. 468, 475 (C.D. Cal. 2012) ("[W]hether the [Protein Content claim] may not have had the 'same impact on all consumers' and may not have informed an individual's buying decision is not relevant, because the standard is an objective one.").

Regardless, Defendants' disagreement with the results of Dr. Dennis' survey is not a basis for exclusion. *See Dzielak v. Whirlpool Corp.*, 2017 WL 1034197, at *18 (D.N.J. Mar. 17, 2017) (declining to exclude Dr. Dennis where "the defendants have stated a disagreement with the results of Dr. Dennis's analysis. … [T]heir argument relies on disputed facts and differences of opinion bearing primarily on the persuasive weight a jury might assign to [his] analysis").

**B.      Dr. Dennis' Survey And Opinions Are Methodologically Sound**

**1.      Matrix Tables Are The Industry-Standard For Creating Hypothetical Marketplaces In Stated Preference Surveys**

Defendants assert that Dr. Dennis' "survey grossly distorts the conditions in which consumers would encounter the challenged product claims in the actual marketplace." Defs.' Br. at 7. Both of Defendants' criticisms on this point are meritless.

First, Defendants argue that Dr. Dennis' survey "does not correspond to market conditions [because] he presents consumers with two identical protein products but then, essentially, whispers in their ear (via a subsequent page) that, in fact, they are not identical because the composition of protein differed." *Id.* That ignores that Defendants' marketing strategy for this 52/60g whey protein product essentially boiled down to obscuring the fact that it had at most 40 grams of whey protein. "While Defendants would prefer that [Dr. Dennis] not

offer the respondents a direct contrast between a product that is and is not sourced exclusively from whey protein, [he] deliberately provided the respondents a direct contrast between the two products to elicit a clear and unambiguous preference for one of the two products." Dennis Reply Report ¶ 43. In doing so, Dr. Dennis "followed industry-standard practice by presenting [his] referendum in a matrix table of text instead of images (showing, for instance, the images of actual labels). The presentation methodology that [he] used corresponds to standard practices in other choice surveys, and is the default presentation in Sawtooth conjoint survey software, the industry leader in online conjoint surveys." *Id.*

Second, Defendants argue that Dr. Dennis' "survey design suffers from blatant focalism bias, a form of priming" because "Dr. Dennis clearly signaled to the respondents that he wanted them to focus on the source and quantity of protein" by "dedicat[ing] an entire page of his survey to offering 'more information' about Products A and B, where the additional information consisted solely of data on how much whey and non-whey protein was in each product." Defs.' Br. at 8. Defendants' criticism ignores that a "stated preference survey … by design involves a binary choice between two products that differ on only one attribute." Dennis Reply Report ¶ 49. This "methodology is appropriate when [as here] there is not an actual marketplace for the good or product whose marketplace value is being measured." *Id.* ¶ 47. Indeed, "[d]uring the class period, Body Fortress consumers in reality did not have the opportunity to make a choice between two distinct products because the Body Fortress product made exclusively from whey did not exist. Only the product sourced with whey and non-whey protein actually existed." *Id.*

Dr. Dennis thus had to "create[] the hypothetical marketplace where these two distinct products are available to respondents for their consideration." *Id.* As he explains, "information provision is an essential step in creating a hypothetical marketplace necessary to capture

consumers' relative preferences for the two products." Dennis Reply Report ¶ 49. Importantly, in doing so, Dr. Dennis "followed the same practices that [he has] used in [his] court-accepted surveys based on the referendum question format." *Id.*[2] Accordingly, this is not a basis to exclude Dr. Dennis' opinions. *See In re Scotts EZ Seed Litig.*, 2017 WL 3396433, at *9 (S.D.N.Y. Aug. 8, 2017) ("There is at least one reason this is appropriate here: no version of EZ Seed was sold on the market during the relevant period without the 50% thicker claim.").

### 2. There Is No Such Thing As A Control Group In Stated Preference Surveys Such As Dr. Dennis'

Defendants next contend Dr. Dennis' survey is unreliable because he "failed to employ a control group" such that "his survey asked the same group of respondents questions about two different hypothetical products while showing the respondents two identical product labels." Defs.' Br. at 9. But as Dr. Dennis explains, this criticism is based on a misunderstanding of the type of survey he actually performed:

> Dr. Hanssens' criticism would apply if I had conducted a survey experiment. As I stated in my deposition and also in my expert report, I relied on the stated preference methodology. Dr. Hanssens does not appear to be aware that control groups are not used and are not appropriate for stated preference surveys. … There is no place for a control group in stated preference surveys because the survey design is based on asking respondents to make choices between distinct alternatives. The NOAA Panel's report on best practices for contingent valuation (derived from stated preference methodology) makes no mention of control groups.

Dennis Reply Report ¶ 45.

Defendants nonetheless urge that "Dr. Dennis's failure to use a control group is

---

[2] Defendants also argue that the survey "effectively forced respondents to pay special attention to those product characteristics even though the respondents may have cared more about other attributes if they had purchased the product in a real-world context." Defs.' Br. at 8. That is baseless speculation. Not only is Dr. Hanssens' opinion irrelevant, *see* Plfs.' Daubert Mot. § II, but "Dr. Hanssens [also] has no evidence to support his claim that respondents [we]re biased by [Dr. Dennis'] presentation of the attributes in the survey." Dennis Reply Report ¶ 49.

particularly strong basis for exclusion here, where … it is compounded by the survey's failure to approximate marketplace conditions." Defs.' Br. at 10. As explained herein, however, none of the purported flaws identified by Defendants – either alone or in their totality – warrant exclusion. Defendants' "reliance on [the] opinion in *THOIP* is somewhat misplaced [because] … [i]t was the combined effect of these major flaws, not the independent effect of either, that led me to exclude the survey in question." *Gucci Am., Inc. v. Guess?, Inc.*, 831 F. Supp. 2d 723, 743-44 (S.D.N.Y. 2011). This criticism thus – at best – goes to the weight of Dr. Dennis' opinions, not their admissibility. *See In re Scotts EZ Seed Litig.*, 2017 WL 3396433, at *8 (criticism that Dr. Dennis did not utilize a control group was not a basis for exclusion because it went to the weight of his testimony, not its admissibility).

### 3. Dr. Dennis Correctly Surveyed Respondents Who Were Representative Of Body Fortress' Target Market

Defendants contend that Dr. Dennis "did not appropriately define the relevant universe or draw a representative sample of respondents." Defs.' Br. at 11. Both attacks are baseless.

<u>First</u>, Defendants argue that Dr. Dennis "defined the survey universe to include adults who in the past five years had purchased any protein supplement containing whey" and "did not even ask the respondents whether they had ever purchased the Product or would consider doing so in the future." *Id.* That is a nonstarter. Dr. Dennis' "survey followed a standard market research practice of surveying actual category purchasers where the relevant category is purchasers of whey protein supplements (powders) in tub containers and purchased for building muscle." Dennis Reply Report ¶ 60. As explained below, in doing so, Dr. Dennis "relied on the Defendants' market research in defining the consumer category." *Id.* As he explains, this is standard practice for stated preference surveys like this one:

> [I]t is a common practice in market research to survey category purchasers instead of purchasers of specific brands and models of

10

> products because of the logistical challenges of obtaining a
> representative sample of a relatively small population of
> consumers. Use of the product category concept in market
> research has its parallels in the actual marketplace. …
> SurveyMonkey, a world leader in online questionnaire tools for
> market research, found category-based sampling so common that it
> developed a suite of online questionnaire templates specific to the
> most common categories for online marketing research … .

*Id.* ¶ 59. Regardless, this criticism only goes to the weight of Dr. Dennis' opinions. *See In re Scotts EZ Seed Litig.*, 2017 WL 3396433, at *8 ("Likewise, defendants' argument that Dr. Dennis should have surveyed people who purchased and used EZ Seed ... rather than people who had previously purchased a combination product or ordinary grass seed …, goes to the weight, not admissibility of Dr. Dennis's opinions.").[3]

    <u>Second</u>, Defendants complain that "[b]y limiting the sample to respondents who primarily were concerned with building muscle, Dr. Dennis almost certainly increased the likelihood that survey respondents would place an outsize emphasis on protein composition and quantity." Defs.' Br. at 12. That is nonsense. "Even a cursory glance at Defendants' market research indicates that 'building muscle' is the primary consumer niche for Body Fortress protein powder." Dennis Reply Report ¶ 58. Even Dr. Hanssens agrees. *See* Ex. 17, Hanssens Dep. at 36:22-37:11 ("Q: Based on your review of the different Body Fortress labels at issue in this case, what is the understanding of Body Fortress brand branding efforts? … [A:] … So Body Fortress as a brand name or a sub-brand name suggests that this is product that is going to make

---

[3] The fact that Dr. Dennis "has limited surveys in other cases to individuals who had actually purchased the products at issue" is of no import here. "For any given research question, there are alternative methodologies that can be evaluated for their fit to answer the research questions; the selection of an appropriate methodology involves considering trade-offs with respect to obtaining valid and reliable data." Dennis Reply Report ¶ 44. Here, "the survey targeting approach [Dr. Dennis] took is a standard one that [he has] adopted on many occasions over the past twenty years and is the same approach that [he has] used in other consumer class actions. In those surveys, [he] successfully adopted the approach of surveying purchasers of the category of the product, as opposed to surveying only the purchasers of the specific product at issue in the litigation." *Id.* ¶ 59 (citing cases).

your body strong, Body Fortress.").

### 4. Dr. Dennis' Opinions Are Not Unfairly Prejudicial

Finally, Defendants argue that Dr. Dennis' opinions must be excluded under Fed. R. Evid. 403 because "the combined effect of these 'flaws [is] sufficiently serious' that the 'probative value of the survey is substantially outweighed by the prejudice, waste of time, and confusion' it might cause." Defs.' Br. at 13 (quoting *Sears, Roebuck & Co. v. Menard, Inc.*, 2003 WL 168642, at *1 (N.D. Ill. Jan. 24, 2003)). But a Rule 403 inquiry is premature at this stage, and should be reserved for trial. *See Remy Inc. v. Tecnomatic, S.P.A.*, 2012 WL 515997, at *4 n.2 (S.D. Ind. Jan. 25, 2012) (holding Rule 403 determination of expert testimony was premature on a *Daubert* motion). Regardless, "Defendants have not articulated why consideration of the surveys in this manner would create a risk of prejudice that substantially outweighs their probative value." *Black & Decker Corp. v. Positec USA Inc.*, 2015 WL 5612340, at *10 (N.D. Ill. Sept. 22, 2015). This case is not like *Menard* where the "court found that a customer confusion survey was inadmissible where 'respondents were exposed to only 8- or 9-second portions of the parties' 30-second television commercials and 10-second radio advertisements.'" *Id.* at *22. Indeed, the "jury will be free to discount or disregard the surveys altogether" upon cross-examination. *Black & Decker Corp*, 2015 WL 5612340, at *10; *United States v. Kemp*, 2017 WL 2719328, at *4 (S.D. Ind. June 23, 2017) ("Defendants' concerns regarding the quality and precision of the evidence can be resolved through cross examination of [Dr. Dennis].").

## II. DR. CAMPBELL'S OPINIONS ARE RELEVANT AND WILL ASSIST THE JURY

### A. Dr. Campbell's Opinion That The NPNs That Comprise The SRB Are Not Protein Is Uncontroverted

Defendants do not contest Dr. Campbell's opinion that the NPNs that make up the SRB

are not protein – nor could they.  Defendants' own expert, Dr. Wu, testified:

> Q: Is creatine monohydrate a high-quality protein?
>
> A: Under scientific definition, it's not a high-quality protein.
>
> Q: Can I say that's your answer also for taurine, glutamine, leucine, isoleucine, valine, and glycine?
>
> A: Under scientific definitions, they are not proteins.

PSOF ¶ 18 (Ex. 10A, Wu Dep. at 93:4-12; *id.* at 101:7-102:3 (same as to threonine)).

Defendants' witnesses, Todd Putzbach and Jennifer Rendall both agree.  PSOF ¶ 17; Ex. 4A,

Rendall Dep. at 174:19-25.  *See also* Class Cert. Mot. at 11-12.

**B.    Dr. Campbell's Opinion About The Value Of The SRB Is Admissible**

> *1.    Dr. Campbell Properly Considered The Only Advertised Benefit Of The SRB – Recovery*

Defendants argue under Fed. R. Evid. 403 that Dr. Campbell's opinions regarding the

value of the SRB "are unhelpful to the factfinder, and thus inadmissible … because they only

address the narrow issue of whether the Product's non-whey amino acids can assist with exercise

recovery." Defs.' Br. at 13.  But exercise recovery is precisely what the Product's label promises

these ingredients accomplish.  *See, e.g.*, Ex. 21 (Formulation 4 label listing these ingredients as

the "Super Recovery Blend"); *id.* ("The combination of potent ingredients within the Super

Recovery Blend is important for athletes since it allows for faster recovery during high-intensity

workouts."); Ex. 8A; Putzbach Dep. at 24:12-14 ("Q:  What does it mean to recover in the phrase

'super recovery blend?'  A:  It was a post-workout product so it was based upon, um, helping

you recover from workouts."); Ex. 7A; Sciortino Dep. at 115:19-116:1 (same).  "Unlike juices,

milks, fruits, and other food products about which false health claims are made, the primary

purpose of … supplements is not to provide sustenance and nutrition.  Supplements are not

purchased as food products with the purpose of obtaining calories." *McCrary v. Elations Co.*

*LLC*, 2014 WL 12589137, at \*17 (C.D. Cal. Dec. 2, 2014).[4]  Thus, supplements, such as the Product, should be evaluated based on their label promises, not other alleged ancillary benefits.

The absurdity of Defendants' appeal to non-advertised benefits is all the more apparent when considering creatine monohydrate.  Defendants cite to creatine as an ingredient that is valuable at the dosages included in the Product.  Defs.' Br. at 14.  But the Product labels ***do not even disclose the amount of creatine in the Product***.  *See* Exs. 18-21; *see also* Ex. 5A, Cornacchiulo Dep. at 120:7-10 ("Q:  Does the old label [Exhibit 21] on the left-hand side say how much creatine is in the product?  A:  Creatine, no.  Q:  It doesn't tell you creatine, does it?  A:  No, I don't see it on the bottle, no.").  The only reference to creatine on the label was in the small print "Super Recovery Blend" portion of the Supplement Facts panel, which Mr. Cornacchiulo described as "[h]ard to see."  *Id.* at 80:18-23.  And the only way to ascertain the amount of creatine in the Product was to reference the formula, which consumers did not have access to.  *Id.* at 121:11-22 ("Q:  So if I wanted to know how much creatine was in the old label [Exhibit 21], I would need to reference the formula, right?  A:  Yes. … Q:  Do consumers have access to the formula?  A:  No.").  In other words, Defendants want to ascribe a value to an ingredient whose dosage level consumers would have no way of knowing.[5]

### 2. *Dr. Campbell's Opinion Is Not Contrary To Comcast*

The crux of this portion of Defendants' Motion is that "Plaintiffs' damages model must account for *any value* consumers received from the non-whey ingredients."  Defs.' Br. at 14.  But

---

[4] Defendants attempt to distinguish *McCrary* on the basis that "many consumers use the Product 'as a meal replacement.'"  Defs.' Br. at 15.  That statement is not supported by the cited deposition testimony of Dr. Campbell.  *See* Ex. 32, Campbell Dep. at 114:17-23 (testifying that "<u>some</u> people just consume protein supplements [not specifically the Product] as a meal replacement").  And even if that statement was supported by the cited deposition testimony, it does not distinguish *McCrary* as that case relied on the <u>primary</u> purpose of supplements.

[5] Adding to the absurdity of Defendants' argument, Mr. Putzbach testified that creatine's benefit is to "provide[] recovery" after workouts.  Ex. 8A, Putzbach Dep. at 29:10-14 ("Q:  What general benefits does creatine monohydrate have for a consumer?  A:  It provides recovery.  Q:  After workouts?  A:  Yes.").  Mr. Putzbach did not identify any of the purported non-advertised benefits that Defendants cite.

that is wrong.  As the *Suchanek* court explained in denying a similar *Daubert* motion:

> [T]he Court does not believe that evidence regarding value of the ingredients and packaging of GSC has any bearing on the assumption that GSC had no value.  Of course the ingredients and the packaging of GSC were worth *something* – the ingredients and packaging of any product always cost money and are never free. For example, even a probiotic that provides no digestive benefits, grass seed that doesn't grow grass, bird seed that is unfit for consumption because it contains pesticides, and a drinkable joint supplement that does not provide any joint health benefits, all contain ingredients that have some monetary value. … Contrary to Defendants' assertion, pertinent case law illustrates that the mere fact that the components or the packaging of a product have value does not cut the legs out from under the assumption that a product is valueless or the opinion that a full refund is an appropriate measure of damages.

*Suchanek v. Sturm Foods, Inc.*, 2017 WL 3704206, at *7 (S.D. Ill. Aug. 28, 2017) (citing cases).

Other courts across the country have endorsed this reasoning.  *See, e.g.*, *McCrary*, 2014 WL 12589137, at *17; *United States v. Kennedy*, 726 F.3d 968, 974 (7th Cir. 2013) (approving full refund damages in counterfeit art case even though the counterfeit art still had some value); *Martin v. Monsanto Co.*, 2017 WL 1115167, at *8 (C.D. Cal. Mar. 24, 2017) (approving underfill damages model); *F.T.C. v. Figgie Int'l, Inc.*, 994 F.2d 595, 606 (9th Cir. 1993) ("[W]e return to the hypothetical dishonest rhinestone merchant.  Customers who purchased rhinestones sold as diamonds should have the opportunity to get all of their money back. … The fraud [is] in the selling, not the value of the thing sold … ."  Here, the Product is a whey protein supplement. Consumers purchased it to consume whey protein.  PSOF ¶¶ 20-25.  Therefore, any value attributed to the NPNs that Defendants used to manipulate the Protein Content claim (PSOF ¶¶ 12-19) need not be accounted for in Plaintiffs' damages model.

Defendants' reliance on *In re POM Wonderful LLC*, 2014 WL 1225184 (C.D. Cal. Mar. 25, 2014), does not compel a different conclusion.  As the *McCrary* court explained, "the

15

primary purpose of … supplements is not to provide sustenance and nutrition. Supplements are not purchased as food products with the purpose of obtaining calories." *McCrary*, 2014 WL 12589137, at *17. And as Judge Leinenweber stated, the decision in *POM Wonderful* was "incorrect." *Mednick v. Precor, Inc.*, 2017 WL 2619139, at *9 (N.D. Ill. June 16, 2017). Its reasoning would lead to the absurd conclusion that "[i]f a full refund model indeed depends on such a stringent assumption, then a full refund can never be an appropriate measure of damages. As long as a defendant can show that a single class member – however idiosyncratic in his preferences or unique in his circumstances – received a single benefit, however slight, then the assumption fails and the model must be tossed." *Id.*

> 3. *Defendants Do Not Identify Any Purported Benefits That Dr. Campbell Neglected To Consider*

Even if Defendants were correct that Dr. Campbell should have considered other physiological benefits of the SRB, they do not identify those benefits.

First, Defendants cite testimony from Dr. Campbell's deposition discussing a 2012 study that purported to study glycine's role with sleep. *See* Defs.' Br. at 14. Of course, there is no evidence that any reasonable consumer purchased the Product to sleep better, nor is the Product marketed as a sleep aid. But regardless, as Dr. Campbell explains in his Reply Report, "the subjects in this study were sleep deprived subjects," and "the glycine was consumed by the subjects in this study 30-minutes before bed. Nowhere on the Body Fortress product labels were there instructions to take the product 30-minutes before bed." 12/21/18 Response Report of Dr. William Campbell ("Campbell Reply Report") at 27.

Second, Defendants argue that Dr. Campbell incorrectly opines that the NPNs in the SRB are worthless because they "only improve exercise performance and increase lean body mass," the same benefits that whey protein provides. Defs.' Br. at 15. But Dr. Campbell did not opine

16

that the "non-whey ingredients" in the SRB provide those benefits. *See* Ex. 32, Campbell Dep. at 118:6-120:6 (discussing potential benefit of creatine only). And more importantly, Dr. Campbell made clear at his deposition that NPNs do not provide the same benefits as whey protein because "[p]roteins contain peptide bonds," while "free form amino acids do not," and thus the human body better metabolizes whey protein. *Id.* at 185:16-187:17.

### 4.      *Exclusion Under Rule 403 Is Inappropriate*

Even if Defendants were correct that Dr. Campbell should have considered other physiological benefits of the SRB, it would not necessitate exclusion under Rule 403. Under Rule 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "Relevant evidence will be excluded under Rule 403 only if its probative value is 'insignificant compared to its inflammatory nature so that the evidence *unfairly* prejudices the defendant.'" *Wielgus v. Ryobi Tech., Inc.*, 2012 WL 3614642, at *7 (N.D. Ill. Aug. 21, 2012) (citation omitted) (emphasis in original). Here, Defendants not only chose to label these NPNs as the "Super <u>Recovery</u> Blend," but also Defendants chose to highlight their purported ability to allow for "faster recovery during high-intensity workouts." Ex. 21. Thus, any prejudice resulting from Dr. Campbell's opinion that these NPNs are worthless for recovery is the result of Defendants' labeling choices.

### C.      **There Is No Analytical Gap Between Dr. Campbell's Opinions And The Data He Cites**

Defendants argue that "Dr. Campbell's opinions also must be excluded because there is 'too great an analytical gap' between the opinions offered and any data supporting them." Defs.' Br. at 16 (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). That is wrong.

First, Defendants argue that "Dr. Campbell often cites no evidence for his opinions." Defs.' Br. at 16. In support, Defendants point to Dr. Campbell's opinions concerning the amounts of glycine and threonine in the Product. *Id.* But as Dr. Campbell explains in his Reply Report, this "is because no papers exist that have reported that glycine improves exercise performance or enhances recovery from exercise." Campbell Reply Report at 26; *id.* at 28 (same for threonine). Indeed, Defendants' expert, Dr. Wu, was also unable to identify any such studies. *Id.* Thus, Defendants are improperly attempting to assign value to these two ingredients within the SRB, without any scientific evidence that their dosages are sufficient.

Second, Defendants argue that "in concluding that the amount of each amino acid in the SRB is worthless, Dr. Campbell inexplicably failed to account for the additional amount contained in whey protein." Defs.' Br. at 17. That is wrong. As an initial matter, that argument ignores that NPNs do not provide the same benefits as whey protein because "[p]roteins contain peptide bonds," while "free form amino acids do not," and thus the human body better metabolizes whey protein. Ex. 32, Campbell Dep. at 185:16-187:17. And even so, there is no evidence that the additional dosages of amino acids found in whey protein naturally are sufficient to change Dr. Campbell's opinions. Defendants specifically point to glutamine, but "the highest amount of glutamine that could be present in the Body Fortress supplement would be 3.2 grams. The minimum effective dosage of glutamine is still 6.25 times more than this. There is no scientific study that has shown 3.2 grams of glutamine as being effective for improving recovery from exercise." Campbell Reply Report at 29. Defendants point to a study that purportedly showed beneficial increase in "plasma concentrations of growth hormone and bicarbonate" and improved "renal function," [6] but as explained in Section II.B, the SRB is supposed to assist with

---

[6] Ironically, Defendants now claim that the glutamine dosage in the Product "improve[s] renal function," but the Product's label warns consumers to "[a]void this product if you have kidney disease." Ex. 21.

recovery from exercise. Whatever ancillary benefits it may have are not relevant.

Third, Defendants argue that Dr. Campbell's opinions "rest on the assumption that consumers would ingest no more than *one* scoop of the Product in any given day." Defs.' Br. at 17. But "[i]t is appropriate for experts to make assumptions in reaching their opinions as long as their assumptions are based on the expert's field of study or supported by evidence." *Fond Du Lac Bumper Exchange, Inc. v. Jui Li Enters. Co.*, 2016 WL 756568, at *2 (E.D. Wis. Feb. 26, 2016). Here, the label instructs consumers to "add one (1) scoop (42g) to 6-8 ounces of water or your favorite beverage daily." Ex. 21. Dr. Campbell's assumption is supported by the evidence.

Defendants also argue that "even Dr. Campbell admits the benefit of the ingredients at the 'two scoop level,'" because he acknowledges a study regarding 3.9 grams of taurine – 0.1 grams less than is contained in a two-scoop serving of the Product. Defs.' Br. at 18. But the study utilizing 3.9 grams of taurine was performed on "untrained males (not serious athletes)." Campbell Report at 11. Again, the Product's label instructs consumers (not serious athletes) to "add one (1) scoop (42g) to 6-8 ounces of water or your favorite beverage daily." Ex. 21. Only "[s]erious athletes and bodybuilders" are instructed to "consume 1-2 scoops immediately after exercise." *Id.* Therefore, any effect a two-scoop serving may have on untrained males is irrelevant. Furthermore, the "study [that] most closely approximates the recommended ingestion instructions for serious athletes on the Body Fortress label" found that "approximately 8 grams of taurine taken after exercise and for the next two days was reported to have no effects on muscle recovery over time." Campbell Report at 11. As such, serious athletes – the only people instructed to ingest a two-scoop serving – see no benefit from ingestion of 4 grams of taurine.

Fourth, Defendants argue that "Dr. Campbell cited at least one study [Ex. 35, 2013 Khorshidi-Hosseini] for the *opposite* conclusion of what it demonstrated." Defs.' Br. at 18. But

that is incorrect. The 2013 Khorshidi-Hosseini study did **not** "conclude[] that glutamine supplementation by 'young adult humans before sprint exercise can improve the function and strength of their skeletal muscle. *Id.* Instead, the 2013 Khorshidi-Hosseini study utilized four groups: (1) a peptide glutamine only group; (2) a maltodextrin only group; (3) a peptide glutamine plus maltodextrin group; and (4) a placebo group. Ex. 35 at 133. The study found "no significant decreases in time series and among groups in relation to fatigue index." *Id.* The study only found "significant differences between the P [placebo] and GM [glutamine plus maltodextrin] group in the third bout indicating strong influence of combination of maltodextrin and glutamine in comparison with consumption of glutamine and maltodextrin alone." *Id.* (emphasis added). In other words, the study "reported that [glutamine alone] is not effective." Campbell Report at 14. Moreover, the study used substantially higher dosages of glutamine and maltodextrin than are found in the Product. Study participants were given 50g per serving of maltodextrin, 20.5g per serving of glutamine for the glutamine only group, and 18.5g per serving of glutamine for the glutamine plus maltodextrin group. Ex. 35 at 132-33. By comparison, "the dosing of glutamine for the second, third, and fourth set of formulas ranged from … 0.00510 grams … to 1.02040 grams … per one scoop of product." Campbell Report at 14. And the dosing of maltodextrin for Formulation 4 was approximately 3.78257 grams. Ex. 15.

Finally, Defendants argue that "[b]ecause Dr. Campbell cited studies that lack any power calculation, he cannot rely on those studies as evidence that glutamine does not improve exercise performance." Defs.' Br. at 19. As the Seventh Circuit has explained, under Rule 703 "an expert must employ 'those kinds of facts or data' on which experts in the field would reasonably rely." *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 809 (7th Cir. 2013). Here, Dr. Campbell relied on published, peer-reviewed studies in reputable journals in his field. *See*

20

Campbell Report at 13-16. And as Dr. Campbell explained in his deposition, "[i]n many studies in our field, the authors will not publish or present the power calculations." Ex. 32, Campbell Dep. at 62:11-14. Therefore, the lack of a power calculation has no bearing on the admissibility of Dr. Campbell's testimony. *See, e.g.*, *Thakore v. Universal Mach. Co. of Pottstown*, 670 F. Supp. 2d 705, 730 (N.D. Ill. 2009) (admitting expert testimony that relied on peer reviewed methodology and noting "[t]he weight and credibility of the data relied upon … may be challenged on cross-examination at trial").

## III. MR. WEIR'S OPINIONS ARE RELEVANT AND WILL ASSIST THE JURY

### A. Mr. Weir's Underfill Damages Methodology Is Admissible

#### 1. *Mr. Weir's Underfill Damages Methodology Is Not Derivative Of Dr. Campbell's Opinion That The SRB Is Worthless*

Defendants argue that "[b]ecause Dr. Campbell's opinion is inadmissible for the reasons stated above, Weir's derivative opinions must also be excluded." Defs.' Br. at 19. But for the reasons stated above, Dr. Campbell's opinion is admissible, thus this argument fails. Moreover, even if Dr. Campbell's opinions were inadmissible, Mr. Weir's underfill damages methodology would still be admissible, as Mr. Weir provides other bases for excluding any value derived from the SRB, including Mr. Cornacchiulo's testimony that consumers of the Product wanted whey protein, and Dr. Dennis' survey findings. *See* Weir Report ¶¶ 10-12.

#### 2. *Mr. Weir's Reply Report Moots Defendants' Criticisms*

Defendants repeat their argument that Plaintiffs' "damages model must account for any value consumers received from those non-whey ingredients and other product features." Defs.' Br. at 20. That is wrong for the reasons stated in Argument § II.B.2, above. But even if that were true, Defendants ignore that Mr. Weir's reply report proposes a model which accounts for any value consumers received from the SRB. *See* Weir Reply Report ¶ 10. Specifically, Mr.

Weir proposes "to subtract the value of the [SRB] from the market price, and then apply the underfill factors to the remaining value of the Whey Protein as in the formula below:"

$$(Market\ Price - SRB\ Value) \times Underfill\ Factor = Damages$$

*Id.* Mr. Weir then performs those calculations across the 10 states in Plaintiffs' proposed classes, for Formulations 1-4. *Id.* ¶ 11. Defendants' only response is a conclusory statement buried in a footnote: "Weir purports to adjust for this marketplace data in his Reply Declaration, but these calculations undercount the value of the non-whey ingredients." Defs.' Br. at 23 n.8. Defendants provide no explanation as to how Mr. Weir's analysis "undercount[s] the value of the non-whey ingredients." And even so, this criticism goes to the weight of Mr. Weir's testimony, not its admissibility. *See Lees v. Carthage College*, 714 F.3d 516, 526 (7th Cir. 2013) ("Carthage is free to argue that community standards would have been a preferable benchmark, but that again is a matter of evidentiary weight, not admissibility"). Thus, even if the Court finds that Plaintiffs are required to account for the value derived from the non-whey ingredients, Mr. Weir has done so in his reply report, and his testimony is therefore admissible.

   3.   *Defendants' Remaining Criticisms Of Mr. Weir's Underfill Methodology Fail*

The majority of Defendants' criticisms of Mr. Weir stem from their argument that Plaintiffs' damages model must account for any value consumers received from the non-whey ingredients. Defs.' Br. at 21-23. Plaintiffs have already rebuked those arguments in Argument § II.B.2, above. However, Defendants' citation to *In re 5-Hour Energy Marketing and Sales Practices Litigation*, 2017 WL 2559615 (C.D. Cal. June 7, 2017) bears mention, as the case is easily distinguishable. In *In re 5-Hour Energy*, plaintiffs "allege[d] that Defendants deceptively and misleadingly marketed 5HE as 'five hour energy' or providing 'hours of energy' when 5HE provides only a few minutes of energy at most." *Id.* at *1. However, "the meaning of the term

22

'energy' [wa]s disputed, and Plaintiffs … offered no evidence of a common definition of 'energy' among a substantial number of consumers." *Id.* at *9. "Plaintiffs argue[d] that 'energy' means 'caloric energy,'" while "Defendants argue[d] that consumers define 'energy' more broadly to encompass subjective feelings of energy and an increased ability to perform tasks." *Id.* Thus, the *In re 5-Hour Energy* underfill damages model was inadequate because it did "not account for the value of the caffeine, vitamins, and minerals in 5HE," all of which provide "energy" as that term is understood in a colloquial sense by a reasonable consumer. *Id.* at *10.

Here, by contrast, there is no dispute that whey protein is the only type of "protein" in the Product. PSOF ¶¶ 16-19. Nor is there any dispute that the Product's label promised 52/60g of whey protein. PSOF ¶¶ 12-15. Indeed, Dr. Dennis found that 95.1% of survey respondents "understood the Body Fortress packaging to communicate that all the protein in a two-scoop serving was sourced from whey protein … ." Dennis Report ¶ 19.

Judge Gutierrez explicitly recognized this distinction in *In re 5-Hour Energy*. As Judge Gutierrez stated, the underfill methodology is "appropriate [where] plaintiffs allege[] that [defendant] sold them less [of the Product] than they promised." *In re 5-Hour Energy*, 2017 WL 2559615 at *11 (citing *Martin*, 2017 WL 1115167, at *9-11). "[W]hen the issue is only how much of the product the consumer received, few would contest that the consumer received no value from the product that they did not get." *Id.* Thus, this case is more analogous to *Martin*, in which Mr. Weir's underfill damages methodology was approved. As in *Martin*, "Plaintiff's theory of liability is that class members were harmed when [Defendants] sold them [the Product] that did not [contain as much whey protein] as promised." *Martin*, 2017 WL 1115167, at *8. Mr. Weir's underfill damages methodology is therefore appropriate.

The remainder of Defendants' criticisms are misguided. Defendants argue that "Weir

fails to cite any data for his central assumption that no portion of the market price is attributable to the Product's brand, look and feel, taste, mixability, or other attributes." Defs.' Br. at 23. But as Mr. Weir explains in his reply report, those attributes are accounted for in his underfill model. Weir Reply Report ¶¶ 17-23. "When looking at Body Fortress as promised versus the same Body Fortress as underfilled, one does not need to explicitly control for those attributes as you might in a side-by-side analysis. The analysis handles these issues by the very nature of the underfill." *Id.* ¶ 18. For example, "[o]f course the whey protein in [the Product] has taste and texture – and consumers have been denied 25-34% of that taste and texture." *Id.* ¶ 20.

Defendants also argue that "Weir incorrectly assumes that the value curve of whey protein is linear … [b]ut the assumption of a linear relationship runs contrary to the canonical idea in economics of declining marginal utility." Defs.' Br. at 24. But that criticism is meritless because, "[s]uppose a jug of Body Fortress promised 100 servings of 40 grams of protein, but because of the underfill, delivered only 100 servings of 30 grams of protein. If a person can only benefit from 30 grams of whey protein, they would be able to consume 133 30-gram servings if Defendants had delivered on their promise. Instead, because the product is underfilled, such consumers only receive 100 servings of their desired size." Weir Reply Report ¶ 27.

Defendants' "marginal utility" argument is also contrary to the evidence in this case. As Mr. Cornacchiulo testified, the Product's labeling claims were designed "to attract a market of people who wanted higher protein products." Ex. 5A, Cornacchiulo Dep. at 208:21-209:15.

### B.  Mr. Weir's Statutory Damages Model Is Uncontested

Defendants do not contest Mr. Weir's statutory damages model which he proposes to calculate class-wide damages under New York GBL §§ 349 & 350. *See* Weir Report ¶¶ 27-30; Weir Reply Report ¶¶ 29-32. Accordingly, even if the Court were to exclude Mr. Weir's underfill damages model, his statutory damages model is sufficient. "[B]ecause NYGBL § 349

permits statutory damages, it does not matter <u>how much</u> the alleged misrepresentations increased the purchase price, so long as the price paid was higher than it otherwise would have been." *In re Amla Litig.*, 328 F.R.D. 127, 138 (S.D.N.Y. 2018) (emphasis in original); *see also Suchanek*, 2017 WL 3704206, at *15 ("Regardless of the amount of damage – whether it is a full refund or a partial refund – it will be, without question, less than $50. So it doesn't seem to matter what the exact amount of damage is when class members in … New York will not be collecting that amount – they will be collecting the statutory damages amount instead."). Thus, "[j]ust as a consumer who bought a box purporting to contain five widgets, only to discover that just four widgets were inside has clearly been bilked, so too is a consumer promised an amount certain of whey protein, only to receive 25-34% less than promised economically injured." Weir Reply Report ¶ 32; *see also In re Amla Litig.*, 328 F.R.D. at 138 (same); *Lazaroff v. Paraco Gas Corp.*, 967 N.Y.S.2d 867, at *6 (N.Y. Sup. Ct. 2011) (plaintiff alleged injury under GBL § 349 where he alleged that propane tanks were 25% underfilled and he therefore did not "receive what was promised"). Indeed, Dr. Garrett, concedes ███████████████████████████████████████ ███████████████████████████████████ Weir Reply Report ¶ 6 (citing Garrett Report Ex. 2); *see also* PSOF ¶ 39 (citing Garrett Report ¶ 26). Thus, "[t]he instant cases' battle of experts on price differential is largely beside the point. Once an injury is established, statutory damages can be precisely calculated for each class member. New York General Business Law § 349(h) provides for statutory damages of $50 to each class member for each time defendant violated the statute." *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 551 (E.D.N.Y. 2017).

## CONCLUSION

Plaintiffs respectfully request that the Court deny Defendants' Motion to Exclude.

Dated: June 28, 2019

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:     */s/ Philip L. Fraietta*
                Philip L. Fraietta

Philip L. Fraietta*
*pfraietta@bursor.com*
Frederick J. Klorczyk III*
*fklorczyk@bursor.com*
**BURSOR & FISHER, P.A.**
888 Seventh Avenue
New York, New York 10019
Phone:  646.837.7150
Fax:  212.989.9163
*Admitted Pro Hac Vice*

Nick Suciu III
*nicksuciu@bmslawyers.com*
**BARBAT, MANSOUR & SUCIU PLLC**
1644 Bracken Rd.
Bloomfield Hills, Michigan 48302
Phone: 313.303.3472

Joseph J. Siprut
*jsiprut@siprut.com*
Michael M. Chang
*mchang@siprut.com*
**SIPRUT PC**
17 N. State Street
Suite 1600
Chicago, Illinois 60602
Phone: 312.236.0000
Fax: 312.878.1342

***Attorneys for Plaintiffs
and the Proposed Classes***

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that a true and correct copy of the foregoing **Plaintiffs' Memorandum of Law In Opposition to Defendants' Motion to Exclude The Opinions Of Michael Dennis, William Campbell, and Colin Weir Under *Daubert* And Federal Rules of Evidence 403 and 702** was served this 28th day of June, 2019, on all counsel of record electronically via the Court's ECF filing system and via email.

*/s/ Philip L. Fraietta*
Philip L. Fraietta